UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
**Case Number: 9:15–cv–81569–KAM**

PAH CO.,

      Appellant,                 Bankruptcy Case No. 11–19665–EPK

vs.

GARY P. ELIOPOULOS,

      Appellee.

_____/

## MOTION TO DISMISS APPEAL AND SUPPORTING MEMORANDUM OF LAW

      Appellee, Gary Eliopoulos ("Mr. Eliopoulos"), pursuant to Rule 8018 of the Federal Rules of Bankruptcy Procedure, requests that the Court dismiss this appeal due to the willful failure of the appellant, PAH Co. ("PAH"), to file an initial brief.  In support of this request Mr. Eliopoulos states:

## BACKGROUND

      1.     PAH is appealing several sanctions orders entered against it by United States Bankruptcy Judge John K. Olson, which relate to an unsuccessful effort to disqualify counsel for Mr. Eliopoulos.

      2.     The principal of PAH is an individual named Peter Halmos ("Mr. Halmos"). Counsel for PAH in this appeal is Nicholas Halmos, the son of Peter Halmos.

      3.     The Court has granted PAH several extensions to file an initial brief.  *See* ECF Nos. 13–18.  Pursuant to the most recent such order, the deadline for PAH to file a brief was Monday March 21, 2016.  ECF No. 18.

4.      During the evening of March 21, Mr. Halmos e-mailed undersigned counsel (the "Halmos Email").  A copy of the Halmos Email (including an attached draft Rule 60 motion) is attached as **EXHIBIT "A"**.  The Halmos Email states:

> Mr. Landau,
>
> Considering the order in case 80960, the defective record in this case, and the serious due process issues already identified, among others, a legitimate appeal is—in our opinion—precluded.
>
> Attached please find a pro se Rule 60 that will be filed tomorrow.
>
> Given the extraordinary judiciary retaliation to date and anticipated, we've decided PAH Co's lawyer Nicholas Halmos has better things to do.
>
> Accordingly, PAH Co will not be filing its appeal tonight and instead will be seeking more appropriate relief.
>
> Pursuant to 60(b)(4) any person whose rights are affected has standing to assert invalidity, directly or collaterally, so as to this first Rule 60 there should be no standing issues. Exhibits to the attached and scrivener's error correction will follow shortly.
>
> Thanks.  Peter

5.      As the Halmos Email demonstrates, Mr. Peter Halmos (a) is displeased with this Court ruling in favor of Mr. Eliopoulos in a separate bankruptcy appeal, Case No. 9:15–cv–80960–KAM, (b) is of the opinion that "a legitimate appeal is…precluded" and (c) believes the counsel of record for PAH "has better things to do" than pursuing the instant appeal.

6.      On March 29, undersigned counsel (both Philip Landau and Patrick Dorsey) each received copies of the Halmos Email via certified mail return receipt requested.  Later on that date, the undersigned e-mailed counsel for PAH, Nicholas Halmos, to inquire whether he would be filing a notice withdrawing the appeal.

7.      On March 31, PAH filed a notice with the Court.  ECF No. 19.  The notice states in relevant part that "legitimate appellate review of the orders and issues noticed for appeal is impossible.  Proceedings pursuant to Rule 60 of the Federal Rules of Civil Procedure are in preparation."  *Id.*

8.      To date, PAH has not filed an appellate brief.

9.      Unfortunately, Mr. Eliopoulos is all too familiar with bizarre litigation behavior from PAH, which now includes the willful failure to file an appellate brief.  Mr. Eliopoulos has incurred hundreds of thousands of dollars in attorneys' fees defending himself from the company in well over a decade of litigation.

10.     Both presiding judges in the underlying bankruptcy case, Judge Olson and United States Bankruptcy Judge Erik P. Kimball, have commented on the vindictive manner in which PAH conducts itself.  For example, during a trial between the parties that occurred in early 2014, Judge Kimball remarked, "I think that this litigation, and the litigation preced[ing] it, were to a great extent a vendetta against the debtor."  Mar. 18, 2014 Trial Tr., p. 1375, ll. 18–20.[1] Moreover, during a recent hearing on disputed record designations in both this appeal and a later-abandoned appeal before this Court filed by Peter Halmos, individually,[2] Judge Kimball made the following observations:

- "But this colloquy shows me Mr. Halmos will indeed grossly increase the cost of moving on with this subject appeal."

- "…a great deal of what's happened in the bankruptcy case has been aimed at making sure Mr. Eliopoulos spends as much money as possible. That was my conclusion. That was Judge Olson's independent conclusion in a matter I had nothing to do with, and so now there are two of us at this court who have concluded that the primary goal of PAH Co. is to crush Mr. Eliopoulos, even if there is no cognizable claim against him."

---

[1]      The transcript is docketed at ECF No. 194, Adv. Proc. No. 11–02657–EPK.

[2]      Case No. 15–cv–81601–KAM.

- "You should have sat through the five days of evidentiary hearing that I did. It, I would say, had no precedent in my experience. None whatsoever. A great number of the claims, which were dropped after the trial, were ludicrous. They had absolutely no basis in reality, did not exist…and we spent days on those. Why did we spend days on those? Great question, and they were dropped, because they were meritless. And so that is what I have seen in this case."

Jan. 6, 2016 Hr'g Tr., p. 35, ll. 16–18; p. 37, ll. 4–12; p. 37, l. 23–p. 38, l. 8. A copy of the transcript is attached as **EXHIBIT "B"**.

11.     Indeed, on the very morning this motion was filed, Judge Kimball awarded costs against PAH and Mr. Halmos in connection with a motion to approve settlement filed by the chapter 7 trustee in Mr. Eliopoulos's bankruptcy case, Michael Bakst. In particular, PAH and Mr. Halmos filed objections to the motion but did not appear at a scheduled evidentiary hearing. Uncertain of whether PAH or Mr. Halmos were contesting his motion, Mr. Bakst was required to prepare for the hearing and present hours of evidence. Judge Kimball has also issued on order to show cause why PAH's prior counsel in the bankruptcy case, Trent Swift, Esq., should not be sanctioned for failing to appear at the evidentiary hearing. (Mr. Swift filed an emergency motion to withdraw as counsel for PAH the night prior to the hearing.) *See* ECF Nos. 388, 396, 428, 558, 559, 563, 565, 566 and 568, Case No. 11–19665–EPK.

12.     PAH Co. and its principal, Peter Halmos, have habitually wasted the bankruptcy court's judicial resources, Mr. Eliopoulos's hard-earned funds, and now this Court's resources. Mr. Eliopoulos respectfully requests that the Court end such behavior by dismissing the appeal and reserving jurisdiction to award sanctions pursuant to Federal Rule of Bankruptcy Procedure 8020.

## <u>ARGUMENT</u>

Federal Rule of Bankruptcy Procedure 8018 governs the filing of briefs and appendices in bankruptcy appeals. Rule 8018(a)(4) states in relevant part, "If an appellant fails to file a brief

on time or within an extended time authorized by the district court of BAP, an appellee may move to dismiss the appeal—or the district court or BAP, after notice, may dismiss the appeal on its own motion." The filing of a brief is not a jurisdictional prerequisite, and failure to timely file a brief does not require dismissal in every case. *Brake v. Tavormina (In re Beverly Mfg. Corp.)*, 778 F.2d 666, 667 (11th Cir. 1985). Notwithstanding this, the Eleventh Circuit has determined that dismissal is proper "when bad faith, negligence or indifference has been shown." *Brake*, 778 F.2d at 667 (citation omitted).[3]

PAH has demonstrated bad faith and indifference to its March 21 briefing deadline. The deadline was specifically requested by PAH. ECF No. 17. The Court granted that request. ECF No. 18. Instead of filing a brief, the principal of PAH has (1) stated that "a legitimate appeal is—in our opinion—precluded," because of an unfavorable ruling in another matter, (2) determined that PAH's attorney "has better things to do" than comply with the deadline, and (3) deliberately chosen not to file a brief. *See* Ex. A. To any extent the beliefs of Mr. Halmos were arguably distinct from those of PAH, the company has given notice reiterating it will not file a brief. ECF No. 19.

PAH has not missed its briefing deadline due to an honest mistake or calendaring error. The company has instead determined its lawyer has better things to do, deliberately chosen not to file a brief, and advertised this position to opposing counsel. It is difficult to imagine a more flagrant disregard for the deadline, and dismissal is appropriate.

### LOCAL RULE 7.1(a)(3) CERTIFICATION

---

[3]     *Brake* analyzes former Rule 8009. The Federal Rules of Bankruptcy Procedure were substantially revised in 2014, and Rule 8018 is derived from former Rule 8009 and Federal Rules of Appellate Procedure 30 and 31. *See* Fed. R. Bankr. P. 8018, advisory committee notes (2014 Amendments).

Local Rule 7.1(a)(3) does not apply *inter alia* to a motion "to involuntarily dismiss an action."  Nonetheless, in an abundance of caution, counsel for Mr. Eliopoulos certifies that on March 29, 2016, at approximately 5:00 P.M., Philip Landau, Esq. e-mailed Nicholas Halmos, Esq. to inquire if the appeal would be voluntarily dismissed, in light of the Halmos E-Mail. Counsel for PAH responded via e-mail the next day that "PAH Co. will notice the Court of its position shortly," and subsequently filed the notice at ECF No. 19.

WHEREFORE, Mr. Eliopoulos respectfully requests that the Court dismiss this appeal, reserve jurisdiction to award sanctions and grant such other and further relief as it deems appropriate.

## Certificate of Service

I HEREBY CERTIFY that on March 31, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record by Notices of Electronic Filing generated by CM/ECF.

**SHRAIBERG, FERRARA & LANDAU, P.A.**
Attorneys for Mr. Eliopoulos
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email:  plandau@sfl-pa.com


By:   */s/ Philip J. Landau*
Philip J. Landau, Esq.
Fla. Bar. No. 0504017
Patrick Dorsey, Esq.
Fla. Bar. No. 0085841

# EXHIBIT A

**Philip J. Landau**

| | |
|---|---|
| **From:** | peter halmos et al. <snafuworld@gmail.com> |
| **Sent:** | Monday, March 21, 2016 11:37 PM |
| **To:** | Philip J. Landau |
| **Cc:** | joanie |
| **Subject:** | RULE 60 |
| **Attachments:** | SANCTIONS RULE 60 AP FINAL  PPPP.pdf |

Mr. Landau,

 Considering the order in case 80960, the defective record in this case, and the serious due process issues already identified, among others, a legitimate appeal is -- in our opinion -- precluded.
Attached please find a pro se Rule 60 that will be filed tomorrow.
Given the extraordinary judiciary retaliation to date and anticipated, we've decided PAH Co's lawyer Nicholas Halmos has better things to do.
Accordingly, PAH Co will not be filing its appeal tonight and instead will be seeking more appropriate relief.

Pursuant to 60(b)(4) any person whose rights are affected has standing to assert invalidity, directly or collaterally, so as to this first Rule 60 there should be no standing issues. Exhibits to the attached and scrivener's error correction will follow shortly.

Thanks.  Peter
--
UNLESS SNAFUWORLD DIRECTLY AND DEFINITIVELY RESPONDS TO A COMMUNICATION, THE COMMUNICATION HAS NOT BEEN RECEIVED NOR CAN RECEIPT BE CONSTRUED.  ALL RIGHTS, CLAIMS, DEFENSES EXPRESSLY RESERVED. NO WAIVER INTENDED OR IMPLIED, NOR CAN WAIVER BE CONSTRUED.

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 9:15-cv-81569-KAM

PAH CO.,                                    Bankruptcy Case No. 11-19665-EPK

        Appellant,

v.

GARY ELIOPOULOS,

        Appellee.

_____/

**MOTION FOR RELIEF FROM ORDERS [ECF 324], [ECF 392] AND [ECF 414]
PURSUANT TO FED. R. BANKR. P. 9024 EXTENDING
FED. R. CIV. P. 60(b)(3); 60 (b)(4) AND 60(b)(6)**

Peter Halmos, pro se
700 So. Olive Avenue
West Palm Beach, FL 33401

c/o James Cooper
1107 Key Plaza
Box 171
Key West, FL 33040

Phone: (305) 731-4570
Email: snafuworld@gmail.com

1

Peter Halmos, pro se, moves for relief from bankruptcy court Sanctions Orders ECF 324, 392 and 414 because, among others, the orders are VOID.

## I. PREFACE

Any person whose rights are affected has standing to assert invalidity. Although PAH Co. is the Creditor in this bankruptcy case, the party in interest is Peter Halmos. PAH Co. is represented by Nicholas Halmos, son of Peter Halmos. Now realizing the extent of due process violations at issue and knowing full well the retaliatory sanctions being used to cover-up, as a father, Peter Halmos is not about to put his son in harm's way. Based on this Court's Order in Case No. 15-80960 [ECF 34] and intentionally defective record, no legitimate appeal is possible.

The Rule 60(b)(3) section of this Motion is limited to intrinsic fraud and is not in lieu of Rule 60(d)(1) and (3), extrinsic fraud, among other remedies. All rights expressly reserved. No waiver is intended or implied, nor can waiver be construed.

The content herein is primarily the vacated appeal and shall be substantially supplemented. The supplement shall more fully address the four corners of the three Orders at issue without the artificial restriction of an inadequate record. For procedural purposes, to dispel any standing issues, this Motion's focus is on void Orders because the judges and their former law clerks acted, and continue to act, in a manner inconsistent with due process Fed. R. Civ. P. Rule 60(b)(4), 28 U.S.C.A.; U.S.C.A. Const. Amend. 5. *Klugh v. U.S.*, 620 F. Supp. 892 (D.S.C. 1985):

> **Void judgment**. One which has has no legal force or effect, invalidity of which may be asserted by any person whose rights are affected at any time and at any place directly or collaterally. Reynolds v. Volunteer State Life Ins. Co., Tex. Civ. App., 80 S.W.2d 1087, 1092. One which from its inception is and forever continues to be absolutely null, without legal efficacy, ineffectual to bind parties or support a right, of no legal force and effect whatever, and incapable of confirmation, ratification, or enforcement in any manner or to any degree. Judgment is a "void judgment" if court that rendered judgment lacked jurisdiction of the subject matter, or of the parties, or

2

**acted in a manner inconsistent with due process.** Klugh v. U.S., D.C.S.C., 610 F. Supp. 892, 901. See also Voidable judgment. (Black's Law Dictionary, Sixth Edition, p. 1574). (Emphasis added.)

A void judgment is one which from the beginning was complete nullity and without any legal effect, Hobbs v. U.S. Office of Personnel Management, 485 F.Supp. 456 (M.D. Fla. 1980).

## II. INTRODUCTION

### Record on Appeal is Defective

PAH Co.'s appeal is vacated because, among others, the record on appeal is prejudicially incomplete. The record has been determined by Judge Kimball [Appeal ECF 10.3] over objections and despite every effort by PAH Co. and Peter Halmos to include designated essential evidence. [ECF 457 and 458]. Judge Kimball's threats of sanctions are the only reason their efforts stopped. Likewise for Peter Halmos' individual attempt to participate in this appeal.1 Accordingly, this record on appeal precludes legitimate appeal.

Moreover, this record on appeal is materially falsified. For example, at page 6 of the October 6, 2014 deposition of Eric Pendergraft ("Mr. Pendergraft") is the admonition: "You also have the right to change your deposition testimony after the fact. However, if you do so I am entitled to infer that you weren't telling the truth the first time." [10/6/2014 Pendergraft Dep. at 6:3-6]. Among numerous material after-the-fact "corrections" Mr. Pendergraft made and/or has admitted to2 is his handwritten "errata sheet" correction and the October 10 court reporter's Certificate of Correction. (**Exhibit __**). Mr. Pendergraft's cryptic "correction" speaks volumes about the insidious subterranean Rule 9003 and other violations that are the heart of this case.

---

1 PAH Co., Peter Halmos and related parties affected, directly or indirectly, expressly reserve all rights. No waiver is intended or implied, nor can waiver be construed. The term "clearly erroneous" is used herein only for compliance in form to Rule 52(e)). This appeal is not in lieu of and does not preclude all other procedural and substantive remedies.
2 Mr. Pendergraft has yet to be deposed as to these "corrections" and related newly discovered information.

Mr. Pendergraft's "correction" states:

> I also talked about the Eliopoulos main bankruptcy case/adversary case/current motion to disqualify controversy very briefly with Judge Paul Hyman on September 22, 2014 at the cocktail reception before the Bankruptcy Bar Association Installation dinner. Judge Hyman tapped me on the shoulder and expressed his dismay that two former Judge Kimball law clerks were at such odds with each other.3

The matters Mr. Pendergraft and Judge Hyman prohibitively discussed "very briefly" encompass the pending disqualification and sanctions orders. This prohibited ex parte contact emblematic of a course of conduct, including systemic due process violations that are being covered-up, retaliatory imposition of completely meritless sanctions having no competent evidentiary and legal bases. It is no innocent mistake that Mr. Pendergraft's October 6 deposition transcript [Appeal ECF 10.21 at p. 443-529] excludes this Certificate of Correction and handwritten "errata sheet."

## Judge Kimball's December 23, 2014 Order [ECF 324] is Void

Judge Kimball steadfastly and repeatedly denied having anything to do with the Motion to Disqualify SFL and SFL's abusive sanctions motions that were sent to Judge Olson [ECF 253].4 For just one example: Judge Kimball: "I did not have the evidentiary hearing on those

---

3 Rule 9003 Prohibition of Ex Parte Contacts: Except as provided by applicable law, all interested persons "shall refrain from ex parte meetings and communications with the court concerning matters affecting a particular case or proceeding ... to insure that the bankruptcy system operates fairly and that no appearance of unfairness is created." This Rule is not a substitute for or limitation of any applicable canon of professional responsibility or judicial conduct. See, e.g., Canon 7, EC 7-35, Disciplinary Rule 7-110(B) Code of Professional Responsibility; Canon 3A(4) Code of Judicial Conduct: "A judge should ... neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding."

4 Judge Kimball's Order conveying this matter to Judge Olson contains material "error"—an extremely prejudicial and not unusual occurrence—such as misrepresenting the amount of PAH Co.'s proof of claim. This "error" is prominently promoted in unsworn misrepresentations, a/k/a "argument," by SFL's Mr. Landau. Judge Olson prohibitively accepts such misrepresentations as fact in manifest disregard of the actual record evidence. Judge Olson therefore concluded Peter Halmos "is crazy" and Peter Halmos' settlement "bottom

4

matters, nor did I enter the order on these matters that are under appeal." [ECF 533 at p. 6]. It is no big surprise Judge Olson was hand-picked: "**This matter was discreetly sent to me, not for me to deal with, because it deals with significant conflicts5 between two former law clerks of Judge Kimball**...." (Emphasis added.) [ECF 328 at p. 199].

Whomever "discretely" hand-picked Judge Olson clearly had an agenda. An admittedly unscientific survey of sanctions imposed by the seven bankruptcy judges in the Southern District of Florida since 2006 found 11 sanctions imposed by Judge Olson and a total of three sanctions by all six other bankruptcy court judges combined. Judge Olson likewise has a penchant for issuing arrest warrants. Although highly material, Judge Olson's history of serious ethics and conduct transgressions, including involving the Trustee Michael Bakst in this case,6 shall be

---

line" confidences conveyed to Mr. Pendergraft were publicly known, demonstrating Peter Halmos' "utter irrationality." [ECF 324].

5 Apparently, conflicts among former bankruptcy court law clerks, rather than their wrongdoings, are the cause of "dismay." When six ex-law clerks (SFL) egregiously disrespect the rules and due process for their own pecuniary benefit that causes "dismay" when one of the ex-law clerks blows the whistle, that cause retaliation, victimization, due process abuse of the whistleblower's client. In this context, Mr. Pendergraft's September 22 prohibited ex parte discussion with Judge Hyman is revealing; "Judge Hyman ... expressed his dismay that two former Judge Kimball law clerks were at such odds with each other."

6 Mr. Bakst and Judge Kimball have caused a separate but related litigation circus having no end in sight involving the interrelated Weekes & Callaway ("W&C") case. With Judge Kimball's permission in 2012, Mr. Bakst engaged PAH Co.'s counsel, Alan Espy ("Mr. Espy"). Mr. Espy for years prior to and after 2012 represented PAH Co. and its corporate affiliates in the underlying Europa, Eliopoulos et al. state court cases from which Debtor Eliopoulos ran into this bankruptcy court to evade a jury trial. Mr. Espy had been consulting PAH Co. and Peter Halmos as to their W&C claims since 2011. After 2012, Mr. Espy continued representing PAH Co. et al. in the Europa, Eliopoulos et al. cases and consulting with PAH Co. and Peter Halmos as to their W&C claims. Unknown to PAH Co. and Peter Halmos—Mr. Bakst, by counsel Mr. Espy, has attorney-client privileges with Debtor Eliopoulos in the W&C case while concurrently representing PAH Co. against Eliopoulos in the state court cases, involving substantially the same facts. In 2015, Peter Halmos asked Mr. Espy to withdraw from all representations when discovering intolerable conflict, and engaged new counsel to prosecute the existing state court cases as well as file their W&C claims. Mr. Bakst thereupon had Judge Kimball issue a Bar Order against the PAH Co. and Peter Halmos W&C litigation in exchange for $160,000 payment from W&C, of which Mr. Espy received 40% and Mr. Bakst 60% for

addressed in the supplement.

Only by accident did Peter Halmos and PAH Co. discover that the Order denying disqualification Judge Kimball signed and entered [ECF 324] is actually not signed by Judge Kimball nor entered by Judge Kimball:

> Judge Kimball: Can I ask you a very important question? ... What was the time period between the (Motion to Disqualify) hearing in December of 2014 and the entry of an order?
> Mr. Halmos: If I remember, Your Honor entered that Order –
> Judge Kimball: No, I did not.
> Mr. Halmos: I think Your Honor incorporated the findings of fact and conclusions of law.
> Judge Kimball: I did no such thing. I have not entered any --
> Mr. Halmos: Can we get the order?
> Judge Kimball: Mr. Halmos, I promise you – my signature is not on any order in connection with disqualification or sanctions...
> Mr. Halmos: Your Honor, I don't mean to be offensive, I'm just really tired of being called a liar. If you look at Docket Entry 324, that's the order Your Honor signed on disqualification.
> Judge Kimball: I did not sign any order on the motion to disqualify.
> Judge Kimball: Oh. I have no idea why my signature is on that, but I did not cause it to be signed, which means somebody clicked the mouse on my behalf. [1/6/2016 Hrg. Tr. at p. 74-80].

The conflict between former Judge Kimball law clerks that so dismayed Judge Hyman was easily resolved by Judges Olson and Kimball scapegoating, without any evidentiary basis whatsoever, Peter Halmos as a "liar." [ECF 539 at p. 55-58]. Judge Olson was beyond eager to retaliate against and scapegoat Peter Halmos using conclusory "credibility determinations" having no record evidence to support. All three Orders on appeal have in common the expedient and scandalous theme to scapegoat and falsely discredit Peter Halmos as "absolutely implausible," "incredible," "prevaricating," "irrational," "utterly irrational," "fool's errand," "poppycock," "hubristic pique," "disrupt and inflict," "dogged," "stench," "personal vendetta,"

---

their fees. Now Judge Kimball is taxing W&C costs against PAH Co. and Peter Halmos and is sanctioning PAH Co.'s lawyer. Of course Judge Kimball excluded all W&C designations in this appeal record despite that W&C issues are directly involved.

"sanctimonious," "pure applesauce," "pharisaical behavior," "vindictive," "mean spirited," "arrogant," "overbearing bullies." [ECF 324, 392, 414, 328 at p. 217-220].

### III.  JUDGE KIMBALL'S [ECF 324] AND JUDGE OLSON'S [ECF 392, 414] ORDERS ARE VOID

**A.  "The stench emanating from the Motion to Disqualify had driven off the very lawyers who had filed it as soon as that (Peter Halmos' October 6) deposition was taken ... In sum, as soon as the Halmos deposition was taken ... Carter and Stellato sought immediate withdrawal from representing PAH. Stellato and the Carter firm filed the Motion to Disqualify based upon false information given to them by Halmos, and as soon as the falsity of Halmos' assertions was exposed, they withdrew." (Emphasis added.) [ECF 414 at p. 6].**

1.      The competent evidence is 100% to the contrary, as Judge Olson, Judge Kimball and SFL well know. They all have actual knowledge that, for example, despite prohibited threats of being bankruptcy court "blackballed," and having his "life ruined," Mr. Stellato withdrew for the reasons stated in Peter Halmos' October 10, 2014 Objection. [ECF 249]. The day Mr. Stellato withdrew, October 10 (being <u>after</u> Peter Halmos' October 6 deposition), Mr. Stellato affirmatively ratified the Motion to Disqualify merits speaking directly to Judge Kimball:

> Strictly speaking, I would like to say that I have talked with Mr. Halmos about it, and I believe it is a valid motion. I spoke to him at length about it. We spoke about the details of the conversation, and in my belief, privileged, confidential information was divulged that could be used to his disadvantage. I knew that this would not be an easy motion to litigate, or to prosecute, but you know, I believe (SFL) in this case should be disqualified by virtue of this conversation that they had. And I'll just leave it at that. [10/10/2014 Hrg. Tr. at p. 39:13-25].

2.      At the December 18, 2014 purported "evidentiary hearing," Mr. Stellato <u>testified</u> under oath before Judge Olson:

> <u>Q</u>: Mr. Stellato, after the October 6th deposition of Mr. Halmos and PAH, did you still think the motion for disqualification was well founded?
> <u>Mr. Stellato</u>: Yes.
> <u>Q</u>: And after your withdrawal from representing PAH, you still think the motion is well founded?
> <u>Mr. Stellato</u>: Yes, I believe it's meritorious, and I believe it should be granted. [ECF 328 p. 47:19-48:1].

7

3.    On October 7, <u>after</u> Mr. Landau <u>adjourned Peter Halmos' incomplete, unread,</u>

<u>unsigned, partial</u> deposition,7 SFL's Mr. Landau exchanged **"emails with J. Stellato regarding**

**continued Halmos deposition."** (Emphasis added.) [ECF 395 at p. 6]. Mr. Landau's $450

hourly rate resulted in charges of $135 that Judge Olson has awarded in the $167,961.95

sanctions. Also on October 7, Mr. Landau met with PAH Co.'s counsel David Carter, employer

of Mr. Stellato, **"regarding motion to disqualify."** (Emphasis added.) At this meeting, upon

information and belief, Mr. Landau induced Mr. Carter to withdraw from representing PAH Co.

to evade sanctions that Judge Kimball <u>already decided</u>, without any basis in fact and law, to

impose on PAH Co. and Mr. Stellato. To further insulate himself, Mr. Carter discharged Mr.

Stellato's employment. Mr. Landau charged another $135 for this handiwork that Judge Olson

likewise awarded. [ECF 395 at p. 6].

4.    That same morning, October 7 at 8:54 a.m., Mr. Stellato e-mailed Peter Halmos:

> Please let me know as soon as possible what your schedule is today and tomorrow. I
> would like to be able to tell opposing counsel that you are ready to go today and
> tomorrow. I have a mediation in Miami tomorrow at 2 p.m. that I must attend. I also
> have a deposition at 10 a.m. in Miami, but I may be able to move that. If those are not
> available, my advice to you is to attend the deposition on Monday. In any event,
> please let me know about today and tomorrow as I wish to inform opposing counsel
> as soon as possible. **(Exhibit __ )**.

Obviously the "stench" had not yet reached Mr. Stellato.

5.    Again on October 7 at 2:13 p.m., Mr. Landau e-mailed Mr. Stellato, **"regarding**

**continued Halmos deposition."** (Emphasis added.)

6.    Again on October 7 at 4:08 p.m., Mr. Stellato e-mailed Mr. Landau:

---

7 In fact, Mr. Landau imposed a "gag order" on Peter Halmos when he alone adjourned the
October 6 deposition over Mr. Stellato's and Peter Halmos' objection: <u>Mr. Landau</u>: "Mr.
Halmos, I will just remind you that my questioning is still going on, so you are not to discuss
with Mr. Stellato or any other person your testimony." [ECF 241 at p. 93].

"You did not meet and confer with me about your emergency motion, which violates the rule. As for the pending deposition of PAH, today is shot due to your Rule 11 threat. Halmos is not available tomorrow due to a deposition in Fort Lauderdale. He is presently available 11 a.m. to midnight on 10/9, 10/10; 10/11; and 10/12. He is not available on 10/13 and 10/14 regarding a deposition of an expert in FTL. However, depending on the events in that FTL case, he may be able to complete the Eliopoulos deposition in the afternoon to early evening on 10/13. He is available 11 a.m. to midnight 10/15 and 10/16. However, I am not available on 10/15 from 12 – 5 due to a mediation in Miami. I have a 341 in FTL thursday [sic] at 10:00 a.m., but I may be able to get coverage for that. To get these times available, Halmos has to move stuff around a lot. These openings will not hold long. Therefore, please treat this as an emergency. Jesse." **(Exhibit __).**

7.    Also on October 7 at 11:40 p.m., Mr. Stellato e-mailed Mr. Landau **"regarding continued Halmos deposition."** (Emphasis added.) [ECF 395 at p. 6].

8.    Also on October 7 at 11:42 p.m., Mr. Landau e-mailed Mr. Stellato **"regarding continued Halmos deposition"** stating, "Actually Jesse, I have something that has come up with one of my kids at 1pm on Wednesday." (Emphasis added.) **(Exhibit __).**

9.    The next day, October 8, Mr. Landau exchanged **"e-mails and calls with J. Stellato and D. Carter regarding scheduling of depositions"** charging $180 that Judge Olson awarded as sanctions. (Emphasis added.) [ECF 395 at p. 7].

10.    Again on October 8, Mr. Landau e-mailed Mr. Stellato at 11:42 a.m., **"regarding scheduling of depositions"** (emphasis added) stating:

Do you read and think about your emails before you hit send? I have a personal matter with my son the afternoon of the 15th. I think that appointment is a little more important than this nonsense. I am sorry you think it is inappropriate. **(Exhibit __).**

11.    That same day, October 8 at 1:02 p.m., Mr. Stellato e-mailed Mr. Landau **"regarding scheduling of depositions"** (emphasis added) stating:

Phil, I am trying to move a mediation on 10/15 to accommodate you and your son. The mediation was originally scheduled for today, but I moved it to accommodate your two emergency motions and the judge's hearing. You have to understand that I may not be able to make the 10/15 proposed date from 1-5, as I have other clients. I will talk to you about this after the hearing. **(Exhibit __).**

9

12.     In addition to working from morning to midnight scheduling the <u>continuation</u> of Peter Halmos' deposition, on October 7, SFL charged $840 to "draft and revise emergency motion to shorten Rule 11 safe harbor period." Also, SFL charged $390 to "research regarding motions to shorten safe harbor period and to compel." Then on October 8, SFL charged $1,260 to "attend hearings on motion to compel, motion to shorten safe harbor period and substitution of counsel."8 Pursuant to the meeting between Mr. Landau and Mr. Carter on October 7 referenced above. Mr. Stellato substituted for the Carter law firm as Jesse Stellato, P.A.

Contrary to the "stench emanating from the Motion to Disqualify" such that "as soon as the Halmos deposition was taken ... Carter and Stellato sought immediately withdrawal from representing PAH" [ECF 414 at p. 6], Mr. Stellato, Mr. Carter and Mr. Landau were most actively scheduling the continuation of Peter Halmos' deposition and proceeding with the Motion to Disqualify. At this point, Mr. Stellato had been fired by Mr. Carter and had substituted directly as PAH Co.'s counsel.

**Prohibited Ex Parte Trafficking in Evidence**
**to Rig the Motion to Disqualify**

On October 3, 2014, Judge Kimball held a status hearing on the Motion to Disqualify. Judge Kimball compelled Peter Halmos to testify and promised confidentiality:

---

8 To be fully detailed when seeking redress, Mr. Landau had overnight expedited transcription of Peter Halmos' incomplete, unread, unsigned adjourned October 6 deposition. Contrary to Judge Kimball's October 3, 2014 assurances of confidentiality when ordering Peter Halmos to comply with the subpoena and to testify ("Mr. Halmos shall comply with the deadlines of the subpoena." [ECF 328 at p. 208-212], SFL's Mr. Landau—<u>without notice</u> and <u>without authorization</u> from Peter Halmos—filed Peter Halmos' <u>incomplete</u> October 6 deposition transcript in the public court file for free access by anyone worldwide. Concurrently, Peter Halmos is prohibited from discussing his testimony with anyone including his and PAH Co.'s lawyers. At yet another of SFL's countless "emergency" hearings, on October 8, Judge Kimball was careful not to discuss in open court the specifics of Peter Halmos' incomplete deposition transcript that SFL's Mr. Landau had prohibitively earlier that same day filed with the court to intentionally make publicly available. [ECF 278 at p. 4-7].

Judge Kimball: (You need to) reveal the information, which I could order to be thereafter kept confidential ... you've revealed the data, but it can't be used against you." (Emphasis added.) Mr. Stellato: "But the record of the proceeding would still be public." Judge Kimball: "No ... I can close the courtroom, and I can seal the record ... if the information is not harmful, it may still be confidential, and I can seal that component. (Emphasis added.) [ECF 302 at p. 52:10-53:7].

Judge Kimball's instructions at the October 3 hearing were, upon completion of the Peter Halmos and PAH Co. depositions, he will order confidentiality and assured the deposition "can't be used against you." For the disqualification hearing, Judge Kimball would close the courtroom and seal the record. In fact, Judge Kimball assured Peter Halmos and PAH Co. that upon completion of the depositions and after having exercised the rights to read and, if necessary, correct using the "errata sheet" included for that purpose, Judge Kimball will consider any "information (that) is not harmful, it may still be confidential, and I can seal that component." (Emphasis added.) Judge Kimball also ordered Mr. Landau and Mr. Stellato to confer as to discovery matters but expressly required "Mr. Halmos shall comply with the deadlines of the subpoena."9 (Emphasis added.) [ECF 328 at p. 208-212].

The October 3 Motion to Disqualify status conference was for Judge Kimball to explain, among others, the importance of "notice" as required by Rules 4-1.18, 4-1.11 and 4-1.12 Disclosure: Judge Kimball: "Was written notice promptly given to PAH Co ... two issues you should pay close attention to ... the timeliness is to prevent harm." [ECF 302 at p. 16-17] Judge Kimball then determined that SFL's August 4, 2014 Rule 4-1.11 Disclosure [ECF 205] satisfied SFL's disclosure obligation to PAH Co. for Mr. Pendergraft's "recent" employment. Judge

---

9 The date for the Peter Halmos/PAH Co. depositions required a week of arm-wrestling scheduling with Mr. Landau and was confirmed by Mr. Landau in writing on September 15, 2014, for October 6 at 11 a.m. (Exhibit __). (Note: Please see footnote 10). To accommodate Mr. Landau, Peter Halmos had to substantially rearrange schedules impacting the schedules of dozens of others.

11

Kimball then confirmed that written notice to PAH Co. was actually conveyed twice. Once by SFL's Rule 4-1.11 Disclosure. Twice by e-mails between Mr. Pendergraft and Mr. Stellato:

> "Was there actually written notice. at least twice, based on the Court's docket and the documents that I already have before me. One of those forms of notice is ECF 205 itself (SFL's Rule 4-1.11 Disclosure) ... And the other is e-mails between Mr. Pendergraft and Mr. Stellato. It seems to me fairly obvious that there was knowledge (notice), and it was conveyed in written form. That is the purpose of the rule." [ECF 302 at p. 17:1-9].

**Background to the E-Mails Judge Kimball**
**"Already Had Before Me" at the October 3 Hearing**

SFL hired Mr. Pendergraft May 13, 2014 and untimely filed Rule 4-1.11 Disclosure on August 4, 2014 [ECF 205] only after Mr. Stellato blew the whistle. (**Exhibit __**). Rule 4-1.11 requires that Mr. Pendergraft and SFL are disqualified from representing Debtor under (a) or (b) unless: (1) Mr. Pendergraft is timely screened (as defined), receives no income from SFL's representation of Debtor and (2) written notice is promptly given to the government to enable the government to ascertain compliance. SFL did not voluntarily file Rule 4-1.11 Disclosure, nor did SFL promptly file Rule 4-1.11 Disclosure. Nor does SFL provide the government sufficient information to determine compliance with "timely screening" of Mr. Pendergraft. Instead, SFL fraudulently "avers" Mr. Pendergraft was timely screened because, as Judge Kimball confirmed on October 3, "[Y]ou cannot work on a matter that was in chambers, at all, in chambers during the time that you were employed by the Court." [ECF 302 at p. 15:25-16:1-3]. Referring to SFL's August 4, 2014 Rule 4-1.11 Disclosure [ECF 205], Judge Kimball said, "The only question is whether he (Mr. Pendergraft) was, in fact, screened from this case." [ECF 302 at p. 16:12-13]. Mr. Landau thought he had already passed this hurdle having numerous times looked Judge Kimball straight in the eyes representing:

> **Mr. Pendergraft has been screened from every single case that was open while he was clerking for you ... when Mr. Halmos called him that's how the**

**conversation began, I cannot do this because I clerked for the Judge at this time.**
[ECF 302 at p. 40:6-16].

Mr. Stellato was beyond stunned by Judge Kimball's October 3 revelation of having in his possession certain e-mails between himself and Mr. Pendergraft. Prior to October 3, it had not occurred to Mr. Stellato that when he and Mr. Pendergraft, as friends in a social context, exchanged emails on June 5, 2014, about SFL having hired Mr. Pendergraft, this entirely social communication is legally sufficient notice pursuant to Rule 4-1.11 and 4-1.18 to impute to Mr. Stellato's client Peter Halmos. No such e-mails had been produced as of October 3. Yet Judge Kimball not only had the e-mails at the hearing, but considered them as formal written notice to PAH Co. pursuant to Rule 4-1.18.

Mr. Stellato realized someone had provided these e-mails surreptitiously ex parte to Judge Kimball for his use as evidence. It's no surprise Mr. Landau thereafter argued that, by imputation, Peter Halmos10 knew on June 5 that Mr. Pendergraft had joined SFL. Thus Mr. Landau asserted that Peter Halmos and Mr. Stellato strategically waited to file the Motion to Disqualify until September 3. Consequently, Judges Olson and Kimball concluded, without any competent record evidence whatsoever, the Motion to Disqualify is Peter Halmos' "deliberate attempt ... to disrupt and dis-rail the bankruptcy proceeding." [ECF 328 at p. 220:21-25]. There is no ambiguity from the record that Judge Kimball 100% believed on October 3 that Mr. Stellato and Peter Halmos <u>knew</u> of Mr. Pendergraft's employment by SFL no later than June 5. This illicit Rule 9003 conveyance of e-mails explains Judge Kimball's bizarre October 3 and subsequent behavior including attributing nefarious intent to anything involving Peter Halmos.

---

10 From March 16 through on or about July 31, 2014, Mr. Stellato represented Peter Halmos, personally, until on July 24, 2014, substituting for Greenberg Traurig [ECF 199].

After the October 3 hearing, Mr. Stellato was truly "dismayed" that Judge Kimball is openly participating in due process violations of constitutional guarantees. Mr. Stellato summarized in December 18 testimony:

> I am a social acquaintance of Eric Pendergraft ... On March 16, 2014, Pendergraft sent me a text message that he had referred Peter Halmos and the representation of PAH Co. to me ... Pendergraft did not indicate to me that he had any substantive conversation with Halmos about the case, or tell me about the length of his conversations with Halmos ... On June 5, I leaned by text message from Pendergraft that he intended to begin working at (SFL) on June 16, 2014 ... That communication had nothing to do with my representation of Halmos. It was a purely social communication ... on July 30, I mentioned to Halmos, for the first time, that Pendergraft was employed by SFL. For the first time, Halmos advised me that he had an extensive and substantive conversation with Pendergraft about undertaking the representation of PAH Co. ... On August 1, I followed up on my e-mail with a personal telephone call to SFL's counsel, Philip J. Landau. Landau indicated that the Halmos-Pendergraft conversation was very brief, and did not agree that SFL should be disqualified. [12/18/2014 Direct Testimony of Jesse Stellato, Esq.]. **(Exhibit __)**.

By October 9, Peter Halmos' life had been turned inside-out by these manifest Rule 9003 violations, tsunami of "emergency" hearings and sanctions motions, and Judge Kimball's suspicious hostility and his without-fail acceptance of whatever ditry-tricks SFL conceived. At 9:13 a.m., Peter Halmos sent the following e-mail to Mr. Stellato:

> I am consulting you about PAH waiving the privilege with you as to the DQ matter only. You concealed your e mails and phone calls with Eric from us and that you knew in early June that Eric is (at SFL). (This) judge is not going to believe that. In fact, you pointed out (how) Kimball screwed up by revealing his knowledge of your e mails ... despite there being no record disclosure of these e mails. You said this alone proves Kimball is having prohibited ex parte communications. I will do whatever is legal to have this fully investigated. You are the sole architect of (this) DQ. After you filed it and the shit began to fly as I told you it would, I also told you if the DQ is not on rock solid ground to withdraw it ... Based on ... Eric's depo...that Eric had at least one ex parte communication with Kimball about the matters I discussed with Eric...there should be some serious consequences to both of them ... I told you I do not want to get sucked into this B court bullshit, and you have now put me in the central line of fire from a ☐ ☐ ☐ ☐ judge using me as a scapegoat.... **(Exhibit __)** (No waiver of privilege intended.)

14

Two hours later that same day, October 9 at 11:38 a.m., Mr. Stellato responded to

Peter Halmos' 9:13 a.m. e-mail:

> "I'm filing a (emergency) motion to withdraw ... will cite irreconcilable differences ...
> you will be more comfortable with a lawyer from outside of this district ... outside the
> confines of the bankruptcy bar ... **So that there be no misunderstanding the reason
> I'm filing to withdraw is not the (Motion to Disqualify) or the effects it has had
> on me personally ... Judge Kimball has already begun to enter sanctions ... For
> this independent reason, I recommend withdrawing the (Motion to Disqualify).**
> (Emphasis added.) (10/9/2014 Jesse Stellato e-mail) (**Exhibit___**).

Judges Olson and Kimball have actual knowledge Peter Halmos' October 6 <u>incomplete</u>

deposition prohibitively, publicly published and filed by SFL's Mr. Landau has nothing

whatsoever to do with the withdrawals of Mr. Carter and Mr. Stellato.[11] Yet Judge Kimball's

December 23 Order [ECF 324] "clearly erroneously" finds that "the information" Peter Halmos

conveyed to Mr. Pendergraft "is now entirely public" as a result of this "fool's errand exercise ...

we are now in the position of Mr. Halmos trying to preserve and protect confidential information

when he's done everything in his power to make public." [ECF 328 at p. 219: 19-25].

At the beginning of Peter Halmos' October 6 deposition, Mr. Landau made the following

representation on which Peter Halmos and PAH Co. relied:

> <u>Mr. Landau</u>: And over the course of the deposition you will have the opportunity to
> change or amend or remember something that you may not have remembered ... if
> that happens ... you supplement your testimony. [ECF 241].

On October 13, the Court Reporter faxed to Peter Halmos page 102 of his October 6

deposition transcript (**Exhibit ___**):

---

11 Peter Halmos, individually, retained Trent Swift, Esq. ("Mr. Swift") for personal
representation at the October 6 deposition. Mr. Swift was present and waited about three hours
for the deposition to begin. Mr. Swift was on the Court's service list for this case.
Nevertheless, Judge Kimball excluded Mr. Swift from representing Peter Halmos personally at
the October 6 deposition, referring to him as "some lawyer off the street." [ECF 241].
Accordingly, Peter Halmos was deprived of counsel at the deposition and was pro se to which
Judge Olson derisively referred at the December 18 hearing.

Dear Mr. Halmos ... the transcript of your deposition taken on October 6, 2014 is available at our office for your review. Please <u>CALL</u> this office by November 8, 2014 for an appointment to review your deposition. (Emphasis original.) (10/8/2014 South Palm Reporting letter) (**Exhibit** _).

That same day, October 13, Peter Halmos responded to the Court Reporter:

As you know from transcribing the incomplete deposition of the corporate representative for Creditor PAH Co., the October 6, 2014 deposition has not been completed. [ECF 241 at p. 11:1-4; 80:16; 80:19; 87:304; 86:21-23; 87:10-11; 93:9-12]. Pursuant to the Court's instruction that the corporate representative shall not discuss testimony with anyone, obviously the corporate representative cannot call you to review the partial transcript, nor can the corporate representative complete the Errata Sheet for the Certificate of Correction. PAH Co. reserves all rights including to review the complete deposition transcript of its corporate representative and to file the Errata Sheet for the Certificate of Correction when the deposition has been completed. (10/13/2014 PAH Co. letter) (**Exhibit** _).

**B.    "The Bigger Issue": The Motion to Disqualify was De Facto**
**Denied Ex Parte the Same Day it Was Filed**

The Motion to Disqualify was prohibitively ex parte predetermined from the start. During Mr. Landau's hyperventilating February 26, 2015 "non-evidentiary smear Peter Halmos campaign," Mr. Landau's habitual name-dropping of Judge Kimball revealed yet another of Mr. Landau's prohibited ex parte cabals on September 3, the same say the Motion to Disqualify was filed:

[A]s I'm standing there in court ... Judge Kimball right away got it, there is a <u>bigger</u> <u>issue</u>. The <u>bigger issue</u> is Mr. Halmos could file a bar complaint against Mr. Pendergraft, against my firm for us<u>ing confidential information if we would have</u> <u>been disqualified</u>. (Emphasis added.) (2/26/2015 Hrg. Tr. at p. 67-68)

There is nothing in Judge Kimball's September 3 hearing transcript about the "bigger issue" or SFL's use of PAH Co.'s "confidential information."  To emphasize "the bigger picture" Judge Kimball "right away got" Mr. Landau boasted of his influence with Judge Kimball: "I've practiced and appeared before Judge Kimball12 almost my entire

career." (2/22/2015 Hrg. Tr. at p. 7).

**C.     If Peter Halmos' Information Conveyed To Mr. Pendergraft Is Public,
        Not Material, And Cannot Be Used Adversely To PAH Co.,
        Why Did Mr. Landau Lie About It?**

Emblematic of Mr. Landau's serial misrepresentations to Judge Kimball: "[W]e recently
hired your former law clerk Mr. Pendergraft ... Mr. Halmos did contact Mr. Pendergraft and Mr.
Pendergraft said, I clerked for the judge, I can't do this, call Mr. Stellato. And that's it."
(9/3/2014 Hrg. Tr. at p. 4-7); and, (2) "[W]hen Mr. Halmos called him that's how the
conversation began, I cannot do this because I clerked for the Judge at this time." [ECF 302 at p.
40].

At Mr. Pendergraft's October 6, 2014 deposition, he was advised: "You also have the
right to change your deposition testimony after the fact. However, if you do so I am entitled to
infer that you weren't telling the truth the first time." (Appeal ECF 10.21 at 6:3-6) Mr.
Pendergraft then <u>denied</u> communicating with any Burr & Forman attorneys about the Peter
Halmos potential engagement: "Did you send attorneys at Burr & Forman any emails about Mr.
Halmos or PAH Co.? <u>Mr. Pendergraft</u>: No." (Appeal ECF 10.21 at p. 73:19-21) To the contrary,
e-mails produced by Burr & Forman prove that prior to initiating the March 16 Peter Halmos
consult, Mr. Pendergraft e-mailed the Burr & Forman managing partner: "I handled parts of this
case while I was working for the judge, so I don't think I can help this guy." [PAH Ex. 5; ECF
328 at p. 70:22-25]. Mr. Pendergraft lied to the Burr & Forman managing partner as to the
content and length of his consultation with Peter Halmos: "I spoke (to Peter Halmos), declined

---

12 Mr. Landau also is a former Judge Hyman law clerk. According to Mr. Stellato, Mr. Landau
  is in the bankruptcy court's "inner circle" along with SFL's Mr. Shraiberg. NOTE: Please see
  Request for Judicial Notice of documents in the Court's files and designated by PAH Co. but
  excluded by Judge Kimball.

the representation due to my conflicts, and referred a person to him who might be able to help."
[ECF 328 at p. 181:22-182:1].

Mr. Pendergraft was dishonest with Peter Halmos in yet another way on March 16, concealing he's negotiating for a job with SFL before and after the March 16 consult.  Mr. Pendergraft: "I applied to work (at SFL) ... towards June of 2013... Brad Shraiberg took me out to Abe & Louie's ... I took a job at Burr & Forman in September of 2013 ... February 2014, I met Brad Shraiberg, and Phil Landau at Abe & Louie's ... we had drinks, we had appetizers ... They asked me would I potentially consider working for them ...  then in March I believe I went out for drinks or dinner with Brad again ... I went to lunch with Bernice Lee (at the Royal Pig) in Fort Lauderdale. In April I went out to dinner, I believe, with all four partners ... then on May 16 Brad Shraiberg extended me an employment offer." [Appeal ECF 10.21 at 23:10-24:25].

### D.   I'm Satisfied the Shraiberg Firm Will Create Screening Procedures That it Presumably Has Never Had to Employ in Formality in the Past

The elements of an effective screen may vary, although two are always required: (1) the screen must be timely imposed and, (2) an ethical wall must be established.13

#### 1.   SFL Did Not Timely Screen Pendergraft; Its Rule 4-1.11 Disclosure is Fraudulent

The Florida Supreme Court in *In re Amendments to the Rules Regulating the Florida Bar14* established the timeliness standard: "In order to be effective, screening measures must be

---

13 *Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 810 (Cal. Ct. App. 2010); *Gaton v. Health Coalition, Inc.,* 745 So.2d 510, 511 (Fla. 3d DCA 1999) (In the context of Rule 4-10, "this allocation of burden acknowledges the difficulty of proving what someone knows and places the procedural hurdle before the law firm that could have best avoided the ethical problem.") The burden is on SFL to prove formal screening as required by Rule 4-1.11, 4-1.18 and 4-1.12 is implemented.
14 933 So.2d 417, 426 (Fla. 2006).

implemented as soon as practicable after a lawyer or law firm knows or reasonably should know that there is a need for screening."

SFL knew of Mr. Pendergraft's conflict new of Mr. Pendergraft's conflict <u>before</u> offering him employment (Appeal ECF 10.21) as testified, "I wouldn't close my door when someone was talking about the case, but people would generally try to avoid talking about this case around me."15 <u>After Mr. Stellato blew the whistle</u>, SFL erected an "ethical wall" Mr. Pendergraft described as:

> Don't talk about this case around Eric, Eric don't talk about this case around other people, and people would generally close their doors when talking about this case, and if I heard people talking about this case I would close my door and try to, you know, continue working and not thinking about what people are saying about me.16

### 2.  <u>SFL Did Not Have a Screen</u>

The typical elements of an ethical wall or a screen are: (1) Physical, geographic and departmental separation of attorneys; (2) prohibitions against and sanctions for discussing confidential matters; (3) established rules and procedures preventing access to confidential information and files; (4) procedures preventing a disqualified attorney from sharing in the profits from the representation; and (5) continuing education in professional responsibility.17 There was no adequate physical separation of Mr. Pendergraft; Pendergraft had unrestricted access to the entire Eliopoulos case file18: "I went into the (Eliopoulos) file and found it in the electronic file . . . I wanted to find this email that everyone was referring to, I found it"19; Mr. Pendergraft received a "surprise bonus" before the December 18 "evidentiary hearing," the purpose and source of which SFL concealed20; no continuing education in professional responsibility.

---

15 Pendergraft Dep. 55:21-24.
16 Pendergraft Dep. 55:8-14.
17 *Kirk,* 183 Cal. App. 4th. at 810-11.
18 Appeal ECF 10.21 at 53:24-54:6.
19 Appeal ECF 10.21 at 44:12-15.

19

3.    **SFL did not Promptly Give Written Notice of Pendergraft's Employment to the Federal Government and PAH Co.:**

Notice increases the public perception of the integrity of the bar, by making the interested party aware of the potential threat to its confidential information and the measures taken to prevent the improper use or disclosure of such information. Moreover, notice establishes an enforcement mechanism in that the interested party will be able to suggest measures to strengthen the wall, and to challenge any apparent breaches.[21]

SFL served PAH Co. its fraudulent Rule 4-1.11 Disclosure on August 4, 2014, more than three months after Mr. Pendergraft was hired. Judge Kimball determined this satisfied SFL's disclosure obligation. [ECF 302]. SFL's disclosure [ECF 205] is untimely, knowingly and intentionally false as to screening; and deceptive by disregarding the requirements to disclose the screening procedures, i.e., <u>fraudulent</u>.

4.    **Mr. Stellato's "Knowledge" of Pendergraft's Employment in June 2014 Cannot be Imputed to PAH**

The June 5 social context e-mail exchange surreptitiously and prohibitively conveyed ex parte to Judge Kimball as inadvertently revealed by him during the October 3 hearing is not and cannot be imputed as formal written notice to Peter Halmos and then imputed to PAH Co. Judge Kimball's open hostility toward Peter Halmos and serial accusations of Peter Halmos "playing games" about what he knew personally and what he knew in a corporate capacity is judge Kimball's "fool's errand" stoked by prohibited ex parte trafficking of "evidence" concealed from Peter Halmos. Had Mr. Pendergraft's and Mr. Stellato's e-mails been legally produced pursuant to discovery rather than illegally and covertly ex parte conveyed to Judge Kimball (and, upon information and belief, Judge Hyman), most of what transpired between September 3

---

20 Appeal ECF 10.21
21 *Kirk*, 183 Cal. App. 4th at 813.

and December 23 could have been avoided, as could have the continuing events by which Peter Halmos and PAH Co. are victimized.

The law is well established that when the knowledge of the agent is not acquired while acting in the course of his employment for his principal, it does not bind the principal.[22] When on June 5 Mr. Stellato received Mr. Pendergraft's text message about SFL employment, Mr. Stellato was not acting as lawyer for Peter Halmos and had not been engaged by PAH Co., the fact that Mr. Stellato did not inform Peter Halmos of these e-mails. Yet the fact that Judge Kimball had ex parte conveyed possession of these emails and the ensuing consequences is emblematic for Rule 9003 prohibition of ex parte contacts.

### E.    Rule 4-1.18 Requires That SFL Be Disqualified

As to public knowledge, Judges Olson and Kimball ignore the law that "opinions and impressions of even public documents and facts would establish privileged communications and if revealed, in any form or fashion, would constitute significant harm.[23] In the *DeDavid* case,[24] the court noted that "[t]he court's duty to preserve the integrity of the legal profession and the adversary system, as well as to avoid even the appearance of impropriety in the instant matter, demand that it exercise its authority to disqualify Grossman as plaintiffs' counsel in this litigation." Information is disqualifying confidential information, even if the information is publicly available:

> Thus, while it is true that the broad outlines of *Miness* and Schulman's discussions appear publicly in the complaint, Schulman still received information from *Miness* related to this case that is not public, including (1) the plaintiff's present thoughts and feelings on the developing situation, (2) the plaintiff's personal accounts of each

---

22 *Ohio Millers' Mut. Ins. Co. v. Artesia State Bank*, 39 F.2d 400, 402 (5th Cir. 1930).
23 *DeDavid v. Alaron Trading Corp.*, No. 10 CV 3502, 2012 WL 1429564, at *2 (N.D. Ill. Apr. 23, 2012).
24 *Id.* at *3.

21

relevant event shortly after it happened, and (3) the plaintiff's strategic thinking concerning how to manage the situation.25

Peter Halmos conveyed his own "connecting the dots" thoughts and feelings, his opinion of the behavior of the judge and the four SFL ex-law clerks using the courtroom as a playground; his concerns about false facts in the adverse Orders' and their impact on other cases. He conveyed to Mr. Pendergraft personal accounts, "connecting the dots" of specific events he was concerned about as and asked for Mr. Pendergraft's advice. He trusted Mr. Pendergraft with his own strategic thinking and "bottom line" settlement number.26 Judges Olson and Kimball ridicule this because, by "clear error" or intent, Judge Kimball's Order transferring to Judge Olson misrepresents PAH Co.'s proof of claim. Peter Halmos conveyed to Mr. Pendergraft there are two proof of claim, each for in excess of $641,000, and that PAH Co.'s witnesses will testify magnitudes higher. In *Zalewski v. Shelroc Homes, LLC*,27 the court addressed such "bottom-line" settlement information in the context of Rule 1.18. The court noted that: "The Court agrees that there is always posturing during settlement, but knowing beforehand a party's bottom line, even if it changes over time, on settlement could be ruinous for that particular party. process and could ultimately control the great stakes ahead."28

In disqualifying, the *Zalewski* court reasoned:

> Key to this decision is that the Court must maintain the integrity of the adversary process. It would be an unfair disadvantage for Defendants to be confronted by an attorney whom they believe possesses intimate knowledge of their views and impressions of this litigation, even though that attorney professes that he has no knowledge nor recalls any, and, if he did, he would not need it or use it in a way to either harm or alarm Defendants. Just having Defendants' opinions and impressions of even public documents and facts would establish privileged communication and if revealed, in any form or fashion, would constitute significant harm.29

---

25 *Miness v. Ahuja*, 762 F. Supp. 2d 465, 480-81 (E.D.N.Y. 2010).
26 Debtor's Mot. Sanctions, ECF 264 at 13.
27 856 F. Supp. 2d 426, 435 (N.D.N.Y. 2012)
28 *Id.* at 435.

22

## IV.  STANDARD FOR RELIEF PURSUANT TO RULE 60
## (EXTENDED TO BANKRUPTCY PROCEEDINGS
## <u>PURSUANT TO FED. R. BANKR. P. 9024.</u>

Pursuant to Fed. R. Bankr. P. 9024, incorporating Fed. R. Civ. P. 60:

> [o]n motion and just terms, the court may relieve a party or its legal representative
> from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud
> (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by
> an opposing party.

Fed. R. Civ. P. 60(b)(3).  "In order to show fraud under rule 60(b)(3), a 'movant must establish

that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the

moving party from fully and fairly presenting his case.'" *S.E.C. v. Financial Warfare Club, Inc.*,

272 F.R.D. 412, 414 (E.D. Penn. 2010). The movant has the burden of proving its assertions

by clear and convincing evidence. *Rozier v. Ford Motor Co.*, 573 F. 2d 1332, 1335 (5th Cir.

1978).30

"Misrepresentation and misconduct are separate grounds for relief under Rule 60(b)(3)

apart from fraud, and neither necessitates showing purposeful misconduct or malice." *Scott v.

U.S.*, F.Supp.3d (2015), Case No. 3:11-cv-1144-J-32PDB, 2015 WL 310604 at *10 (M.D. Fla.

Jan. 26, 2015); *Rally Mfr., Inc. v. Mr. Gasket Co.*, Case No. 87- 1533-civ-Mishler, 1992 WL

211010 (S.D. Fla. June 12, 1992) (collecting cases)(citing e.g. *Schultz v. Butcher*, 24 F.3d 626,

630 ((4th Cir. 1994)("inadvertent as well as intentional failure to comply with a discovery

order constitutes misconduct under Rule 60(b)(3)); *Bros. Inc. v. Grace Mfg. Co.,* 351 F.2d 208,

211 (5th Cir. 1965) ("Fifth Circuit decision that a party can obtain relief due to

---

29 *Id.* at 436.
30 In *Bonner v. City of Prichard*, 661 F. 2d 1206, 1209 (11th Cir. 1981), the 11th Circuit adopted
   as binding precedent all 5th Circuit decisions handed down prior to September 30, 1981.

misrepresentation even in the absence of a deliberate evil purpose to misstate or conceal or thereafter engage in foot-dragging lest the truth might be uncovered.'"")).

"Unintentional neglect in failing to comply with discovery requirements, or negligent misrepresentations to the court, can satisfy the requirements of Rule 60(b)(3), and thus the Court may not deny relief under Rule 60(b)(3) only because Petitioner has not shown intentional misconduct." *Id.* at *11. It is not a requirement of Rule 60(b)(3) that the withheld information "be of such nature as to alter the result in the case." *Scott*, 2015 WL 310604 at *10; *Rally Mfg.*, 1992 WL 211010 at * 5.

PAH Co.'s showing of unintentional misconduct is a sufficient basis for relief pursuant to Rule 60(b)(3). Moreover, because the evidence withheld "would have made a difference in the way [PAH Co.] approached the case or prepared for trial," and because the evidence directly refutes testimony relied upon by the Court in its Opinion, the fraud, misrepresentation or misconduct prevented PAH Co. from fully and fairly litigating its case. *Rozier*, 573 F.2d at 1342 (reversing the trial court's denial of movant's Rule 60 motion).

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via Notice of Electronic Mail through CM/ECF to those parties registered to receive electronic notices of filing in this case on this 21ˢᵗ day of March, 2016, and by First Class U.S. Mail to all parties listed as requiring manual notice in the Court's CM/ECF system.

Respectfully submitted,

By: _____

Peter Halmos, pro se
700 So. Olive Avenue
West Palm Beach, FL 33401

c/o James Cooper
1107 Key Plaza
Box 171
Key West, FL 33040

Phone: (305) 731-4570
Email: snafuworld@gmail.com

## Service List

**Electronic Mail Notice List**

- **Philip Joseph Landau**
  plandau@sfl-pa.com,pdorsey@sfl-pa.com,blee@sfl-pa.com,ematteo@sfl-pa.com,dwoodall@sfl-pa.com,lrosettoparr@sfl-pa.com
- **Noticing Bankruptcy Court**
  CMECF_support@FLSB.uscourts.gov

  Nicholas K. Halmos, Esq.
  Email: Halmos@gmail.com

**Manual Notice List**

**Patrick Richard Dorsey**
Shraiberg, Ferrara & Landau, P.A.
2385 N.W. Executive Center Drive Suite 300
Boca Raton, FL 33431

25

# EXHIBIT B

Page 1

```
1          UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2               WEST PALM BEACH DIVISION
3
              CASE NO. 11-19665-EPK
4
5 IN RE:
6 GARY P. ELIOPOULOS,
7     Debtor.
  _____/
8
9
10
   MOTION TO RECONSIDER (472) and RESPONSE THERETO (481)
11  and MOTION TO STRIKE IMPROPER DESIGNATIONS OF THE
    RECORD ON APPEAL (470) and MOTION TO EXTEND TIME (483)
12 and MOTION FOR EXTENSION OF TIME TO SUPPLEMENT RECORD
      ON APPEAL (456) and RESPONSE THERETO (479)
13
            January 6, 2016
14      The above-styled cause came on for
15 hearing before the HONORABLE ERIK P. KIMBALL, one
16 of the Judges of the United States Bankruptcy Court,
17 in and for the Southern District of Florida, at
18 1515 North Flagler Drive, West Palm Beach,
19 Palm Beach County, Florida on Wednesday,
20 January 6, 2016, commencing at or about 9:30 a.m.,
21 and the following proceedings were had:
22       Transcribed by: Anna M. Meagher
23
24
25
```

Page 2

```
1       APPEARANCES:
2
3    SHRAIBERG, FERRARA & LANDAU, P.A., by
       PATRICK R. DORSEY, ESQUIRE and
4      PHILIP J. LANDAU, ESQUIRE (via Court Call)
         on behalf of the Debtor.
5
6    JONES, FOSTER, JOHNSTON & STUBBS, P.A., by
        SIDNEY A. STUBBS, ESQUIRE
7  on behalf of L. Louis Mrachek, Esquire and Mrachek,
      Fitzgerald, Rose, Konopka & Dow, P.A.
8
9      TRENT J. SWIFT, ESQUIRE
         on behalf of PAH Co.
10
11   GREENSPOON MARDER, P.A., by
       RILYN A. CARNAHAN, ATTORNEY AT LAW
      on behalf of Michael R. Bakst, Trustee.
12
13      ALSO PRESENT:
14      PETER HALMOS, PRO SE
15
            - - - - - -
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1       THE COURT:  Let's have the matter of Gary P.
2 Eliopoulos.  Appearances, ladies and gentlemen.
3       MR. DORSEY:  Good morning, Judge.  Patrick
4 Dorsey on behalf of the debtor, Gary Eliopoulos, and I
5 believe Mr. Landau from my firm is appearing
6 telephonically as well.
7       THE COURT:  I did not see that.
8       Mr. Landau, are you on the telephone?
9       MR. LANDAU:  Yes, your Honor.  Good
10 afternoon.
11       THE COURT:  Good afternoon.  I thought good
12 morning was hopeful on Mr. Dorsey's part.
13       Yes.
14       MR. SWIFT:  Good afternoon, your Honor.
15 Trent Swift, T-R-E-N-T, S-W-I-F-T, on behalf of PAH
16 Co.
17       THE COURT:  Good morn -- afternoon.  Sorry,
18 I'm stuck there as well.
19       Gentlemen.
20       MR. HALMOS:  I'm Peter Halmos appearing pro
21 se.
22       THE COURT:  Mr. Halmos, good afternoon.
23       MR. STUBBS:  Sid Stubbs, your Honor, on
24 behalf of Lou Mrachek and the Mrachek law firm.
25       May I make a request?
```

Page 4

```
1       THE COURT:  Absolutely.
2       MR. STUBBS:  There are only two items --
3       THE COURT:  Right.
4       MR. STUBBS:  -- that have anything to do with
5 Mrachek and his firm.  One is a motion to strike one
6 of the designation with regard to the appeal.
7       THE COURT:  That's right.  That's Item 470,
8 yes.
9       MR. STUBBS:  And we've agreed to that.
10       THE COURT:  Okay.
11       MR. STUBBS:  We agreed that that may be
12 stricken.
13       THE COURT:  Okay.
14       MR. STUBBS:  And the other item is with
15 regard to the motion to increase the bond.  I believe
16 that we're in agreement that they do not seek to
17 impose any additional infor -- excuse me, obligation
18 with regard to the Mrachek firm or Lou Mrachek, and if
19 I'm correct on that, then I would request that I be
20 excused.
21       THE COURT:  Anybody --
22       UNIDENTIFIED SPEAKER:  Well, if I may --
23       THE COURT:  Let's have one more appearance,
24 and then let's come back to that.
25       MR. STUBBS:  Oh, I'm sorry.
```

1 (Pages 1 to 4)

Page 5

1       MS. CARNAHAN:  Good after -- good afternoon,
2 your Honor (laughter), just making sure.
3       THE COURT:  Yes.
4       MS. CARNAHAN:  Rilyn Carnahan on behalf of
5 the trustee, Michael Bakst, and I'm only making an
6 appearance.
7       THE COURT:  Okay.  Very good.
8       Concerns with the requests?  I think each of
9 those is appropriate.
10      MR. DORSEY:  That's fine with me, Judge.
11      I guess it makes sense to take the motion to
12 reconsider first, if Mr. Stubbs wants to stick around
13 for it, but the catalyst --
14      THE COURT:  Well, I think he's asking to go,
15 and so -- but the issue here is that there is a
16 request in connection with a designation, and you've
17 reached agreement with regard to his client's
18 designation, which is a discreet document --
19      MR. DORSEY:  That is correct.
20      THE COURT:  -- correct?
21      And so there can be an agreed order tendered
22 in that regard.
23      MR. DORSEY:  Yes.
24      THE COURT:  And you've not asked me to adjust
25 the bond with regard to his clients.

Page 6

1       MR. DORSEY:  Correct.  The catalyst for the
2 motion to reconsider is Mr. Halmos's individual
3 appeal.
4       THE COURT:  Okay.  Does anybody have a
5 concern with counsel being excused?
6       That means I will not be addressing the bond
7 in any regard in connection with his clients.
8       Mr. Swift, Mr. Halmos, both you?
9       MR. SWIFT:  No concerns from PAH Co., your
10 Honor.
11      THE COURT:  Mr. Halmos.
12      MR. HALMOS:  It's okay, your Honor.
13      THE COURT:  It's okay.  Very good.
14      Thank you for waiting.  I appreciate that.
15 You all should know that I'm going back to an
16 afternoon calendar for Chapter 11s and larger matters
17 because apparently I need it, because it is, in fact,
18 already afternoon.  So that will be soon.
19      Yes.
20      MR. DORSEY:  Just one bit of housekeeping,
21 your Honor.  Many of the matters on today were
22 continued from December.  Your Honor entered several
23 orders, I believe, on December 17th.  Due to an
24 oversight at my firm, two of those orders concerning
25 the motion to strike and the motion to reconsider were

Page 7

1 not served.  Mr. Halmos and PAH Co. are here today,
2 however, and I spoke to Mr. Halmos previously and it's
3 my understanding that he has no objection to
4 proceeding with those --
5       THE COURT:  Well, it's obvious --
6       MR. DORSEY:  -- matters.
7       THE COURT:  -- that they know, and so you
8 need to make sure that they are, in fact, served.  I
9 don't know who else would care, but the parties who
10 care truly are here, so --
11      MR. DORSEY:  I just want to make sure
12 everyone has proper notice.
13      THE COURT:  I don't think we have a due
14 process issue clearly.
15      All right.  So let's go forward with
16 substance.  Where should I begin?
17      MR. DORSEY:  I think really there are two
18 discreet sets of motions.  There are motions regarding
19 the appellate record and a motion to reconsider.  Your
20 Honor indicated earlier that going through the record
21 might be a lengthy process, so maybe it's best to
22 begin with the motion to reconsider.
23      THE COURT:  Sure.
24      MR. DORSEY:  Okay.  Well, Judge, as you're
25 aware, we were here on December 2nd debating about the

Page 8

1 amount of a supersedeas bond.  The appellants
2 requested a bond in 110% of the sanctions amount.  My
3 firm requested 175%, and really the basis for that
4 request was that Mr. Halmos, individually, has filed
5 his own appeal.  We think the appeal is frivolous.  We
6 don't think he has standing to pursue it, and we
7 believe that Mr. Eliopoulos will incur additional
8 fees.
9       I don't want to speak for your Honor, but it
10 seemed clear to us at the December 2nd hearing that
11 you took that factor into account, and you believed
12 that -- I think in the order it's, Mr. Halmos will do
13 everything in his power to turn the appeal into a
14 circus, but you seemed to agree that the 110% bond
15 amount was appropriate, because it was our belief at
16 the time, our mistaken belief, that his notice of
17 appeal was untimely and would be dismissed promptly by
18 a clerk.
19      As set forth in the motion to reconsider,
20 this was an error on my part, and I accept
21 responsibility for that.  Essentially what happened --
22 and I've only been admitted since 2010 when everything
23 has been electronic on ECF, so this was a new
24 experience for me.  Mr. Halmos either hand-delivered
25 or mailed his notice of appeal to the clerk.  It was

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 9

1 stamped on November 16th, which is within 14 days
2 after Judge Olson's sanction order. However, it was
3 not entered on the docket electronically until a week
4 later, and so it appeared that the notice of appeal
5 was not filed until November 23rd, which would have
6 been untimely.
7      Judge, I've seen a lot of motions to
8 reconsider, and typically what happens in those
9 situations is a party asks for a second bite at the
10 apple and says, "Judge, you know, you should really
11 listen to the argument I made the first time, and I'm
12 going to make it again," and I'm not here to do that.
13 We're not here to reargue December 2nd. I think your
14 Honor cited the Tribune case and weighed various
15 factors. There's no need to go through all of that
16 again.
17      The only point I'm making is that to any
18 extent your Honor's ruling on a bond motion was based
19 on the assumption that Mr. Halmos's was untimely, that
20 assumption is incorrect. Mr. Halmos's appeal is very
21 much live at this point in time. And so if that
22 affected your ruling in any way, we would request that
23 you reconsider it under Rule 59.
24      THE COURT: Well, really, has anything
25 changed?

Page 10

1      A party that is not directly a party to an
2 order or a judgment cannot appeal that order or
3 judgment unless they seek to intervene. There is a
4 limited period of time for a person to intervene. I
5 believe it's 30 days after the docketing of the
6 appeal, and in this instance, because of amendments to
7 the 8000 series, I'm pretty sure that docketing means
8 docketing at the District Court, and it seems to me
9 that Mr. Halmos never filed a motion to intervene in
10 the appeal, and, therefore, his notice of appeal is a
11 nullity, nonetheless.
12      And so why would my analysis change?
13      MR. DORSEY: Well, a couple of reasons,
14 Judge. First of all, although that may be
15 procedurally the route that Mr. Halmos should have
16 pursued, there is a live District Court case pending
17 before Judge Marra. We're in the process of preparing
18 a motion to dismiss far lack of standing that we hope
19 will be granted relatively quickly, but be that as it
20 may, Mr. Eliopoulos is continuing to incur fees.
21      And, additionally, prior to the Christmas
22 holiday, Mr. Halmos e-mailed, I believe Mr. Landau at
23 my firm, a Rule 9011 motion of his own, and I'll let
24 Mr. Halmos speak for himself in a moment, but I
25 believe PAH Co. is wishing to file a rule 9011 motion

Page 11

1 with respect to Mr. Eliopoulos's Rule 9011 motion,
2 which was granted by Judge Olson.
3      Now, if PAH --
4      THE COURT: There's a Rule 9011 notice with
5 regard to something on which a court has already
6 ruled?
7      MR. DORSEY: That's correct, Judge.
8      THE COURT: There's no such thing as a Rule
9 9011 motion on something that -- and this can't be by
10 PAH Co., because Mr. Swift is representing PAH Co.
11      MR. DORSEY: Judge --
12      THE COURT: So it must be Mr. Eliopoulos
13 (sic), individually --
14      MR. DORSEY: No, maybe --
15      THE COURT: -- so --
16      MR. DORSEY: -- I'm mangling -- let me try
17 this again.
18      Last year Mr. Eliopoulos filed a Rule 9011
19 motion for sanctions that Judge Olson granted.
20 Mr. Halmos, and I'm not sure whether it's on behalf of
21 him individually or PAH Co. as well, has e-mailed
22 Mr. Landau his own motion for sanctions alleging that
23 our motion for sanctions was frivolous, and it's -- I
24 believe it's his intent -- I'm not sure if the safe
25 harbor period has expired. I believe it's his intent

Page 12

1 to either file that motion, either with this Court or
2 with --
3      THE COURT: How could there be --
4      MR. DORSEY: -- the District Court.
5      THE COURT: -- a safe harbor period? You
6 can't withdraw something that's already been acted on
7 by the Court. The Eleventh Circuit case law is
8 concrete.
9      MR. DORSEY: Judge, I agree with you a
10 hundred percent. But the point is we have to spend
11 time and resources pointing this out and combatting
12 it. I agree with you a hundred percent. I don't
13 think this motion is going anywhere, but the point is,
14 we have to deal with this stuff.
15      I don't think the record designations are
16 serious, but we're here today, and we're presumably
17 going to be here for a large portion of the afternoon,
18 so I think your Honor's prior premonition that
19 Mr. Halmos is doing everything in his power to make
20 this into a circus is unfortunately proving correct.
21 And, yes, you're absolutely correct that on the merits
22 each one of these attempts is going to fail, but they
23 are continuing to churn time and resources.
24      THE COURT: All right. Thank you.
25      Who would like to respond, gentlemen?

3 (Pages 9 to 12)

Page 13

1      MR. HALMOS:  If I may --
2      THE COURT:  Sure, please go to the --
3      MR. HALMOS:  -- I would like to, because
4 these characterizations, I object to.  I'm not going
5 to waste your time about it --
6      THE COURT:  I don't pay much attention to
7 characterizations --
8      MR. HALMOS:  -- because --
9      THE COURT:  -- let's just focus on the facts.
10      MR. HALMOS:  -- things like circus and do
11 everything in my power, I've about had enough of all
12 that.  It's untrue.
13      Now, if untimely is out of the way, I filed
14 an appearance pro se October 10, 2-0-1-4.  I appeared
15 in front of you, your Honor, in that capacity.
16      THE COURT:  In the main case,
17 Mr. Eliopoulos's main case.
18      MR. HALMOS:  I've never understood main case,
19 adversary.  I appeared pro se, and that's as of
20 October 10, 2-0-1-4.  If my appeal requires an
21 intervention after I'm already appearing in the case,
22 then --
23      THE COURT:  Mr. Halmos, let me point out
24 something to you.
25      MR. HALMOS:  Yes, sir.

Page 14

1      THE COURT:  In a Chapter 11 or Chapter 7
2 case, thousands of people can enter an appearance.  I
3 have one case where there are several thousand
4 documents, and there are over 10,000 creditors.
5      If the Court enters an order which sanctions
6 two people, let's just say, A and B, those creditors
7 do not all have the right to file their own notices
8 of appeal from a sanction order, which does not order
9 them to pay any money.  They don't.  If they take part
10 in the action personally, then they may do so.
11      But you do not take part in the action
12 personally.  There was a corporate entity -- you were
13 a witness, apparently -- is that true?  I don't
14 remember.
15      UNIDENTIFIED SPEAKER:  Yes.
16      THE COURT:  Yes.
17      You were a witness.  The corporate entity and
18 counsel were sanctioned, but you were not, and you did
19 not appear personally in connection with that
20 contested matter.  So whether you appear in a
21 bankruptcy case or not has no impact on whether you
22 are subject to an order and a person who might
23 rightfully appeal.
24      Let me also point out that the specific rule
25 regarding intervention was, in fact, cited at the last

Page 15

1 hearing in this matter.  It was addressed on the
2 record at the last hearing, and you never sought to
3 intervene formerly in the appeal.  That is your
4 problem, and it may, in fact, have an impact on what
5 I'm doing today, but your appearing in the case does
6 not do it.
7      MR. HALMOS:  Well, I would like to comment on
8 one thing you said, and that's about who has to pay.
9 And if you read the orders, it mentions my name
10 personally.
11      THE COURT:  Does it?  Does any order direct
12 you personally to pay?
13      Is there an order again Mr. Halmos directing
14 him to pay?
15      MR. HALMOS:  Can I answer?
16      THE COURT:  No, I want to ask Mr. Dorsey.
17      You obtain -- are you attempting to collect
18 from Mr. Halmos personally?
19      MR. DORSEY:  No, your Honor.
20      THE COURT:  Right.
21      MR. HALMOS:  Well, however, because of all
22 these things that have been going on here, PAH Co. is
23 out of money, and I have to pay.  The bond was paid by
24 my personally.  They're going to be collecting from me
25 personally.  They can't collect against --

Page 16

1      THE COURT:  Really, hold on, stop.  Wait,
2 wait, wait.
3      Is there anything in the order that permits a
4 direct ability to collect from Mr. Halmos personally?
5      MR. DORSEY:  No, your Honor.  The order
6 imposes sanctions against PAH Co., Mr. Mrachek's firm,
7 and Mr. Mrachek individually, and Mrachek individually
8 and the Mrachek firm are jointly and severally liable
9 for part of that amount.  There's nothing against
10 Mr. Halmos individually.
11      THE COURT:  Mr. Halmos --
12      MR. HALMOS:  I am --
13      THE COURT:  -- I am aware of your interest in
14 PAH Co., and you may volunteer to pay things, but that
15 order is not directly enforceable against you.
16      MR. HALMOS:  I'm not familiar with federal
17 law.  I am familiar with state law.  I can't imagine
18 it's too much different.  However, a financial
19 guarantor has a right to appear in state court.
20      THE COURT:  So you have simply guaranteed all
21 the obligations of PAH Co.
22      MR. HALMOS:  Of course.
23      THE COURT:  Oh, really?
24      MR. HALMOS:  Yes.
25      THE COURT:  Is that documented?

4 (Pages 13 to 16)

Page 17

1     MR. HALMOS:  Of course.
2     THE COURT:  In what manner?
3     MR. HALMOS:  In documents from the
4 corporate -- the meetings, my checks, I don't -- PAH
5 Co. will not ever be appearing in this court for
6 bankruptcy.  That's just a matter of character, not
7 anything else.  But as the financial guarantor, they
8 call it alter ego, I believe I have a right to appeal
9 these sanction orders.  You may not agree, and that is
10 certainly -- you're the boss, but I believe I have
11 that right.  I'm the one who is on the hook.
12     My name, not as an officer, but as an
13 individual, is smeared all over the record, falsely,
14 and it would be a real injustice that I have no
15 ability to respond, and if there is a circus, your
16 Honor, the circus has been caused by the debtor and
17 their counsel.  And I would like to prove that, and I
18 will.
19     THE COURT:  But, Mr. Halmos, let me ask you a
20 very --
21     MR. HALMOS:  Okay.
22     THE COURT:  -- basic question.
23     Are you the sole owner of PAH Co., the sole
24 shareholder of PAH Co.?
25     MR. HALMOS:  Yes.

Page 18

1     THE COURT:  Yes.  And so PAH Co. has retained
2 counsel, Mr. Swift, sitting at the table over here.
3 It has filed a timely notice of appeal, as far as I
4 can see.  PAH Co. has the right to challenge the
5 order.  Mr. Mrachek and his firm have independently
6 retained, perhaps, one of the most illustrious trial
7 lawyers in the state of Florida to represent them in
8 connection with the appeal.  I have no doubt the
9 issues will be presented in the appeal.
10     You're saying that you have a personal
11 interest.  I have no doubt you do.
12     But hasn't your company, which you are the
13 sole owner of, taken part in the appeal, filed a
14 timely notice of appeal, have the right to move
15 forward with everything?  You cannot act through them?
16     MR. HALMOS:  I cannot act through them.  Our
17 interests are not the same.  Our damages are not the
18 same.  A corporation, your Honor, is an artificial
19 entity.  It doesn't care if it has to wait here five
20 or six hours, it's okay.  It has infinite life.  At 72
21 years of age, your Honor, I don't.
22     THE COURT:  And what does that have to do
23 with --
24     MR. HALMOS:  My damages are different.  I --
25 our positions are different, and I am the one who

Page 19

1 posted the bond, not the company.  The company
2 couldn't do it.  I did it, personally.
3     So the other point is, the motion -- the 9011
4 was not a reciprocal motion against the motion the
5 debtor filed.
6     THE COURT:  What pleading or motion have you
7 asked Mr. Eliopoulos to withdraw?
8     MR. HALMOS:  The 9011 motion was originally
9 filed by Mr. Mrachek, having to do with the motion to
10 convert, that is the motion to convert itself.
11 Mr. Eliopoulos was ineligible, and the motion to
12 convert was withdrawn to conceal evidence, and if
13 anything delayed these proceedings, it was the motion
14 to convert, because --
15     THE COURT:  Mr. Halmos, I should let you know
16 that the motion to convert was pending before me, and
17 I specifically stated that I would not rule on it
18 until I knew whether Mr. Eliopoulos would be able to
19 continue with the counsel he had originally retained,
20 and so I was not going to rule on it until after Judge
21 Olson had ruled on the matter, which is now subject to
22 appeal, and when it came time for me to rule on it, it
23 was withdrawn.  So it didn't hold up anything at all
24 in this case.
25     MR. HALMOS:  Your Honor, the --

Page 20

1     THE COURT:  I believe I've said that in
2 writing.
3     MR. HALMOS:  The motion, the 9011, that was
4 filed regarding the motion to convert, notice has been
5 given --
6     THE COURT:  Was there a 9011 motion filed --
7     MR. HALMOS:  Yes.
8     THE COURT:  -- in connection with the motion
9 to convert?
10     Hold on.
11     MR. DORSEY:  Judge, this might clarify
12 things.  Last spring Mr. Mrachek served our firm with
13 a Rule 9011 motion.
14     THE COURT:  Right.  Which is required.
15     MR. DORSEY:  Which is required.  He never
16 filed it.
17     THE COURT:  Okay.
18     MR. DORSEY:  And basically the gravamen of
19 that motion -- and just paraphrasing, was that, "You,
20 Mr. Eliopoulos, alleged in your sanctions motion that
21 we derailed the bankruptcy case by" -- oh, this gets
22 so convoluted.
23     THE COURT:  Oh, it doesn't matter.  All I
24 care about is whether one was filed.  There was no
25 pending 9011 motion.

Page 21

1     MR. DORSEY:  Correct.  Mr. Mrachek served one
2 last spring.
3     THE COURT:  Right.
4     MR. DORSEY:  Mr. Halmos recently e-mailed a
5 substantially identical one, but none has been filed.
6     THE COURT:  And it's --
7     MR. HALMOS:  Giving notice --
8     THE COURT:  -- aimed at -- it's giving notice
9 with regard to the motion to convert.
10     MR. HALMOS:  Giving notice that in the
11 District Court a 9011 motion will be filed on the
12 motion to convert, as being the cause of whatever
13 delay is being alleged.
14     THE COURT:  Let me explain to you Rule 9011,
15 which is apparent if you read it, and it comes from
16 Federal Rule 11.  It's essentially the same.
17     The idea is that if someone files a
18 complaint, motion, or other request for relief with a
19 federal court, and it is unfounded or it is filed for
20 improper motive -- and there are several categories in
21 the rule -- that you as the respondent to that, the
22 party who would be affected by it -- and by the way,
23 that would not include you individually in this case.
24 But nonetheless, a party affected -- or it might --
25 no, it isn't, because you're not a direct creditor or

Page 22

1 never were in the Eliopoulos case, but, nonetheless,
2 can seek to have sanctions brought.
3     But you must first give the other party, the
4 one that filed the thing, an opportunity to withdraw
5 it, and there's some other rules that apply as well,
6 and so there is the so-called safe harbor period.  You
7 prepare the motion that you intend to file and you
8 send it, along with a cover letter, off to the party
9 that filed the thing that you object to, and they have
10 a limited period of time to withdraw it.  And if they
11 don't, then you file the motion, you ask the court to
12 rule on it, ahead of ruling on the thing that you're
13 complaining about.  One of the prerequisites is that
14 the thing that you're complaining about not have
15 already been acted on, and there's substantial
16 Eleventh Circuit case law on this.
17     So if you're seeking to -- Rule 11 -- if
18 you're seeking essentially Rule 11 sanctions on the
19 motion to convert, there will be no such Rule 11
20 sanctions, I don't care who hears it, because the
21 motion to convert was withdrawn, and there is nothing
22 more that can be done, because the goal of Rule 11 is
23 to get the matter withdrawn.  Now, maybe there's
24 something else, if you get appropriate legal advice,
25 you could do.  But that will get you nowhere.

Page 23

1     MR. HALMOS:  Well, I believe that -- that --
2 that Mr. Mrachek knew what he was doing there, because
3 what was supposed to be withdrawn is their sanctions
4 motion that -- that we caused this derailment of the
5 bankruptcy proceeding, and it's just not true.  If I
6 can say why, I will, otherwise --
7     THE COURT:  Well, this is what -- what's
8 happened --
9     MR. HALMOS:  -- I'll take it up somewhere
10 else.
11     THE COURT:  Well, right, and you already
12 have, through your company --
13     MR. HALMOS:  No, sir.
14     THE COURT:  PAH Co. -- you have.  You filed a
15 notice of appeal with regard to the very sanctions
16 motion and order, the orders, plural.  That's what you
17 filed a notice of appeal of, and you have that venue
18 at the District Court, and if you're unhappy there,
19 then the Eleventh Circuit Court of Appeals, and if
20 you're unhappy there, then a petition for certiorari
21 to the Supreme Court is possible, all those things,
22 but that is the correct course of action.
23     MR. HALMOS:  I believe that I have a right to
24 appear and defend myself and the financial obligations
25 that are, I believe, unjustly heaped upon me, and

Page 24

1 that's personal, not corporate, so I -- that's my
2 position.  If I'm thrown out, then that's an order,
3 and, of course, I'll obey it, and I'll have to do what
4 I have to do.
5     I do not see any harm in allowing me
6 personally to respond to all of these false slurs,
7 accusations, vendettas.  I can read you what they've
8 said, but you can do that on your own if you --
9     THE COURT:  You mean --
10     MR. HALMOS:  -- wanted to.
11     THE COURT:  -- in the orders on the sanctions
12 motions, is that --
13     MR. HALMOS:  In the orders, in the sanction
14 hearing, which was non-evidentiary --
15     THE COURT:  It was an evidentiary hearing, at
16 which --
17     MR. HALMOS:  That was --
18     THE COURT:  -- people testified.
19     MR. HALMOS:  -- on the disqualification, your
20 Honor.
21     THE COURT:  Oh, I see.
22     MR. HALMOS:  On the sanctions order, it was
23 non-evidentiary, and what was said on the record by
24 these people -- I would say 95% of it isn't in the
25 record at all, and it's patently false, it's

Page 25

1 scandalous, and it's directed at Peter Halmos, and I
2 believe I have a right to appeal, especially since I'm
3 paying.
4      Now, you may say I don't, and you might be
5 right.
6      THE COURT:  In the end I won't get to say
7 that.
8      MR. HALMOS:  Well, someone will.
9      However, in the interest of truth, if that's
10 an issue, and I believe it is --
11     THE COURT:  It was at one point.
12     MR. HALMOS:  Well, it was at one point, it
13 should be now too.
14     THE COURT:  Didn't the court, not me, because
15 I didn't hear the matter, and I don't -- have you ever
16 testified here in this courtroom?
17     MR. HALMOS:  I testified in the
18 disqualification, and the judge that --
19     THE COURT:  Not with me.  I had nothing to do
20 with that.
21     MR. HALMOS:  You selected Judge Olson.
22     THE COURT:  I did not.  Mr. --
23     MR. HALMOS:  How did he get in here?
24     THE COURT:  Mr. Halmos, did you testify in
25 this courtroom ever?  I don't think you have.

Page 26

1      MR. HALMOS:  No.  I testified before Judge
2 Olson, and he called me a liar.
3      THE COURT:  That's right.  He made a finding
4 that your testimony was not credible.
5      MR. HALMOS:  He didn't accuse me of perjury,
6 because then maybe I could have done something about
7 that, but he called me a liar when there's absolutely
8 no record evidence whatsoever supporting it, and, in
9 fact, all the record evidence is absolutely the
10 opposite.
11     Now, given that, wouldn't you think it's fair
12 I have a right to defend myself?
13     THE COURT:  Is there anything else you would
14 like to address today?
15     MR. HALMOS:  Yes.
16     On the designations --
17     THE COURT:  We're going to get to that.
18     MR. HALMOS:  Okay.
19     THE COURT:  We're going to get to that.  I
20 mean with regard to the request that you be required
21 to post additional bond.
22     MR. HALMOS:  As to that issue, I'll do
23 whatever your Honor requires.  If I'm thrown out of
24 the case, then I don't think that's necessary --
25     THE COURT:  Well, let me --

Page 27

1      MR. HALMOS:  -- until then though --
2      THE COURT:  There's something I should make
3 clear.
4      MR. HALMOS:  Yes, sir.
5      THE COURT:  There are certain matters that
6 I'm allowed to address here in connection with a
7 pending appeal.  For example, if it turned out that
8 your notice of appeal was, in fact, untimely, I could
9 dismiss the appeal.  There are things that are fairly
10 obvious and concrete, and they're specifically
11 addressed in the District Court's local rules.  This
12 is not one of them.
13     MR. HALMOS:  Okay.
14     THE COURT:  And so that is why I believe
15 counsel for Mr. Eliopoulos suggested there was going
16 to be a motion to dismiss your appeal --
17     MR. HALMOS:  I heard that.
18     THE COURT:  -- in the District Court.  I will
19 have nothing to do with that.
20     MR. HALMOS:  Okay.
21     THE COURT:  In fact, you might be surprised
22 to know, I'll have to go and look if I want to know
23 what happened --
24     MR. HALMOS:  Okay.  So --
25     THE COURT:  -- until much later, so --

Page 28

1      MR. HALMOS:  In that regard, if I'm required
2 to post a bond --
3      THE COURT:  That is the decision I get to
4 make.
5      MR. HALMOS:  -- I would request that it be
6 reciprocal, because why is it always assumed I'm going
7 to lose?  Now, I understand that that is -- seems to
8 be the foregone conclusion, but how do I collect if I
9 win?  It's a two-way street, I would think.
10     But, anyway, I'm suggesting no increase is
11 needed, because when the truth is known, it will come
12 out that Mr. Eliopoulos filed a fraudulent bankruptcy
13 and his lawyers have done everything in their power to
14 turn this into more than a circus, and it's cost a
15 fortune.  It's eaten up a lot of time, and now it's
16 become very personal because of their conduct.  And if
17 I have to post a bond to defend myself from their
18 conduct, I think they should be required, likewise,
19 because sooner or later, we're going to be talking
20 about that.  It's not a one-way street where Peter
21 Halmos loses automatically.  Heads I lose, tails I
22 lose.  That's not what's in a courtroom.
23     THE COURT:  Thank you, Mr. Halmos.
24     MR. HALMOS:  Thank you.
25     MR. SWIFT:  Good afternoon, your Honor.

7 (Pages 25 to 28)

Page 29

1 Trent Swift on behalf of PAH Co. Since the potential
2 increase in bond would affect PAH Co., PAH Co. would
3 just respond --
4        THE COURT: That's an interesting academic
5 question, because the holder of the sanctions order
6 actually cannot collect from Mr. Halmos. Mr. Halmos's
7 assets are not currently subject to any order. They
8 can't pursue him. The only entities that can be
9 pursued are counsel, former counsel and law firm,
10 represented by counsel whose been excused, Mr. Stubbs,
11 and PAH Co., which is the corporate entity.
12       MR. SWIFT: Correct.
13       THE COURT: And the bond was actually
14 provided by those three respondents, not -- although
15 Mr. Halmos says he paid for it, it is not for him,
16 because he's not currently subject to collection.
17       So really the request for me to increase the
18 bond now is aimed only at PAH Co. I just want to make
19 that clear.
20       That's correct, right, Mr. Dorsey?
21       MR. DORSEY: Correct.
22       THE COURT: Yes.
23       MR. SWIFT: I -- not to quibble with your
24 Honor's interpretation, but I believe the basis of
25 increasing the bond --

Page 30

1        THE COURT: Yes.
2        MR. SWIFT: -- although collection is perhaps
3 aimed at PAH Co. --
4        THE COURT: Right.
5        MR. SWIFT: -- the basis for increasing is
6 aimed at or derived from, however we wish to phrase
7 it, Mr. Halmos, who is --
8        THE COURT: The expense --
9        MR. SWIFT: -- separate and apart from PAH,
10 as PAH is a corporate entity.
11       THE COURT: Understood. I understand that.
12 But he's not -- he's not personally -- he says PAH Co.
13 would never come here as a debtor, be that as it may,
14 but the entity could simply collapse or use its assets
15 to pay or walk away, or whatever, right?
16       MR. SWIFT: Mm-hmm.
17       THE COURT: He's not personally responsible.
18 He wants to. He's decided he wishes to pay for the
19 bond and pay for counsel, apparently. I don't know
20 the answer to that, I'm just guessing. But the
21 request -- I just want to make sure it's clear,
22 because you suggested that it was that Mr. Halmos --
23 and I did, in fact, a few moments ago -- put up an
24 additional bond, but Mr. Halmos would not post a bond.
25 That's a little bit strange, isn't it? Because a bond

Page 31

1 is to stay execution of the order, and the order can't
2 be executed against him, so it would be PAH Co. that
3 would be required to put up an additional bond.
4        MR. SWIFT: Correct, with the caveat that it
5 seems that counsel for the debtor is framing the
6 entire argument based on the potential --
7        THE COURT: Potential actions of Mr. Halmos.
8        MR. SWIFT: -- conduct of an entity --
9        THE COURT: Right.
10       MR. SWIFT: -- that is not PAH Co.
11       THE COURT: Correct, but is the sole owner of
12 PAH Co. and, I assume, your primary client contact.
13       MR. SWIFT: Correct.
14       Now, PAH would respond simply that this
15 matter has been considered by the Court, I believe it
16 was December 2nd of 2015. The amount that has been
17 bonded is nearly $180,000, which is an exceptional
18 amount, and so far --
19       THE COURT: What makes it exceptional?
20       MR. SWIFT: Well, I think that's -- that's --
21 my opinion is that it's a very large amount to have
22 reached for a disqualification motion. That's why I
23 say an exceptional amount. I looked at --
24       THE COURT: You're taking issue with the
25 substance of the underlying order, because it is 110%

Page 32

1 of the amount of the order, which I believe is likely
2 a number chosen at the suggestion of Mr. Mrachek,
3 since it mirrors the District Court local rule
4 requirement.
5        MR. SWIFT: No, I'm not taking issue with it
6 in the sense of how we computed it. But I would frame
7 to the Court that this is a very large amount that is
8 bonded for the debtor following, you know, the court's
9 instructions, following the Court's computation
10 method, the District Court's computation method. You
11 weren't --
12       THE COURT: A fee, I did no computation
13 whatsoever, other than to take into account what was
14 offered at the District Court local rule, which I said
15 was a good guideline in light of the provisions of the
16 bankruptcy rule, which no longer reference the bond
17 provision, although they used to --
18       MR. SWIFT: Mm-hmm.
19       THE COURT: -- but they don't anymore. And I
20 did take into account -- again, I cited the Tribune
21 case, take into account the allegation that there
22 would be cost involved and that is the extra ten
23 percent, and the suggestion at the time was that a lot
24 of the additional costs would be caused by -- not by
25 PAH Co.'s corporate actions, although perhaps, but by

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

1 the actions of its principal acting on his own and
2 that that friction will greatly increase the overall
3 cost of litigation, and I believe the allegation was
4 made that that is indeed its intent.
5      MR. SWIFT:  Well, as PAH would respond, the
6 Court has observed, as you just stated, that PAH's
7 actions have been timely and that the percentage
8 increase in the bonded amount is to reflect the extra
9 cost of the appeal.  As PAH is, for all intents and
10 purposes, the interested party here, PAH would respond
11 that, you know, the Court has evaluated this method
12 thoroughly, and as far as its interpretations go, PAH
13 would support and reaffirm all the interpretations
14 this Court made on the December 2nd hearing of this
15 matter, as nothing in PAH's appeal has substantially
16 changed.
17      THE COURT:  Well, how about this, I was
18 pointing out to Mr. Halmos that if I have a notice of
19 appeal that is untimely, it's actually quite simple to
20 get me to dismiss it.  I can do that here, consistent
21 with the District Court local rules.  That is not
22 going to happen now, because to the extent he has a
23 right to file a notice of appeal, he's done so, and it
24 was within the statutory time period, the time period
25 provided in the 8000 rules.  And so, now, the matter

1 must be subject to additional litigation in the
2 District Court.
3      Has his failure to seek to intervene, is that
4 fatal, is it not fatal?  I haven't looked at the case
5 law, and I won't need to make that decision.  It seems
6 to me it should be fatal, based upon the way the rule
7 reads, but who knows what the District Court will do.
8 There'll need to be a motion on that.  There'll need
9 to be a response.  There might need to be argument on
10 that.
11      In the meantime, there are designations of
12 items in the record which could not possibly have been
13 considered by the Court in ruling on the matter under
14 appeal, and which I think are somewhat detached from
15 an understanding of this case.  They've had to file
16 motions on that.
17      Is not the universe slightly different than
18 it was the last time I addressed the issue?
19      MR. SWIFT:  Not being familiar with the case
20 law, your Honor, I couldn't tell you.  It would simply
21 be a guess, and I would not want to hazard a guess.
22      What I would say, though, is it does seem --
23 based on the conversation we've been having, it seems
24 almost a chicken-and-egg conundrum here, which is to
25 say, if Mr. Halmos has an appeal he can pursue, then

1 the debtor contends the bonded amount should be
2 higher.  If Mr. Halmos doesn't have an appeal he
3 should pursue, well, then the bonded amount should
4 remain where it is.
5      THE COURT:  No.  I think there's a third one,
6 and that is, there's an appeal which is subject to a
7 timely notice of appeal, but for which Mr. Halmos has
8 no right to pursue, and that they are going to
9 expend -- and we were all wrong at the last hearing,
10 and they are going to expend a lot more money dealing
11 with that.
12      Let me explain to you why I had the colloquy
13 I had with Mr. Halmos, because I will not be deciding
14 any of those issues.  Doesn't have any impact on me
15 whatsoever, and I'm likely to forget it tomorrow.  But
16 that colloquy shows me that Mr. Halmos will indeed
17 grossly increase the cost of moving on with this
18 subject appeal.  So he has not helped himself in any
19 regard, assuming he still continues to finance PAH
20 Co., he's not helped himself in any regard.  He is
21 simply shown that he will be unreasonable.  That is
22 what I heard.
23      This is someone who refuses to even hear that
24 one can't seek Rule 11 sanctions on a pleading that no
25 longer exists in the docket, because it was, in fact,

1 withdrawn, or if it's aimed at the sanctions motion,
2 it was granted.  You can't seek Rule 11 sanctions with
3 regard to a matter that was granted.
4      It is apparent that he needs individual
5 counsel, and as he is representative of your client,
6 you might want to strongly recommend to him that
7 getting counsel would be helpful, because I don't know
8 if you noticed, but about 20 minutes ago, he
9 essentially said on the record that he is legally
10 responsible to guarantee all of the obligation of PAH
11 Co.  If he had a lawyer in the courtroom, that lawyer
12 would have dropped dead right at that moment.
13      And I said, "Is it documented?"  And he said
14 yes.  So I assume there will be discovery on that
15 basis after this hearing.  I can't imagine anything
16 less advisable for Mr. Halmos to have stood at the
17 podium and stated in connection with this matter.  He
18 badly needs counsel.  I think you should attempt to
19 guide him in that direction.
20      But that colloquy, without regard to its
21 substance, simply showed me that what Mr. Eliopoulos's
22 counsel is arguing is, in fact, true, and it's
23 consistent with my findings in connection with the
24 underlying adversary proceeding.  Mr. Halmos did not
25 attend any of that by the way.  I think you know that.

Page 37

1 You attended part of the adversary proceeding.
2      MR. SWIFT: Part of it, yes, your Honor.
3      THE COURT: And Judge Olson's independent
4 findings, after having Mr. Halmos testify, that a
5 great deal of what's happened in the bankruptcy case
6 has been aimed at making sure Mr. Eliopoulos spends as
7 much money as possible. That was my conclusion. That
8 was Judge Olson's independent conclusion in a matter I
9 had nothing to do with, and so now there are two of us
10 at this court who have concluded that the primary goal
11 of PAH Co. is to crush Mr. Eliopoulos, even if there
12 is no cognizable claim against him.
13      So what does PAH Co. have to say?
14      MR. SWIFT: Well, your Honor, as -- much was
15 rolled into that statement. I believe we had, again,
16 two separate issues there. One was -- one was
17 Mr. Halmos. One was PAH Co. PAH Co. would disagree
18 with the assertion that PAH is undertaking an effort
19 to -- I believe the wording used was "spend as much
20 money as possible," and I believe the word "crush" was
21 also used, that's -- that's just simply not the case
22 here.
23      THE COURT: You should have sat through the
24 five days of evidentiary hearing that I did. It, I
25 would say, had no precedent in my experience. None

Page 38

1 whatsoever. A great number of the claims, which were
2 dropped after the trial, were ludicrous. They had
3 absolutely no basis in reality, did not exist --
4      MR. SWIFT: Oh --
5      THE COURT: -- and we spent days on those.
6 Why did we spend days on those? Great question, and
7 they were dropped, because they were meritless.
8      And so that is what I have seen in this case.
9 You haven't witnessed that.
10      MR. SWIFT: Your Honor, I think maybe a
11 corralling back to the issues at hand might be
12 appropriate. I can't comment as to what occurred
13 during the five-day evidentiary hearing. I can't
14 comment to those --
15      THE COURT: Isn't that the background for
16 everything that's happening in this case? It seems to
17 be at least the catalyst for everything that is
18 happening today.
19      MR. SWIFT: Perhaps we could call the
20 evidentiary hearing the catalyst, but I believe that
21 ultimately the issue in front of the Court at the very
22 moment is the bonded amount for the appeal, a bonded
23 amount which has been posted, a bonded amount which,
24 as of December 2nd, your Honor considered and
25 considered sufficient.

Page 39

1      PAH Co. would say in conduct of PAH's appeal,
2 Mr. Mrachek's individual appeal, and Mr. Mrachek's
3 firm's appeal, the three of which resulted in that
4 bonded amount, nothing has changed. The analysis and
5 evaluation that the Court used on December 2nd is the
6 analysis and evaluation that the Court used on
7 December 2nd in reaching its conclusion.
8      Mr. Halmos's appeal, understandably, is the
9 source of some contention, understandably the source
10 of, you know, perhaps some confusion as to whether or
11 not what the result will be, but as I'm counsel for
12 PAH and simply responding on behalf of PAH to this
13 bonded amount, PAH would submit to the Court that the
14 analysis from December 2nd and the facts therein, from
15 PAH's perspective, ultimately the person responsible
16 for posting the bond, are not changing.
17      THE COURT: Yes. Thank you.
18      Yep.
19      MR. DORSEY: I'm going to be very brief,
20 Judge, because it's very clear to me you get what's
21 going on here, but Mr. -- one comment of Mr. Swift's
22 stood out to me, and he said, well, nothing has
23 changed, PAH is pursuing its appeal, you know, with --
24 logically and no problems whatsoever.
25      PAH Co. and Mr. Halmos filed a joint

Page 40

1 response to the motion to strike last night.
2      Did you get a chance to read it?
3      THE COURT: Yes, I have it here on the bench.
4      MR. DORSEY: Well, Mr. Swift and PAH Co. have
5 apparently endorsed the farcical record designations
6 made by Mr. Halmos. I don't have the response in
7 front of me, but I put one line in my notes that they
8 argue that all of these designations, the
9 communications with Herbert Stettin and Senator
10 Negron, are necessary for the District Court to get,
11 quote, "a complete understanding of the case." And so
12 if      Mr. Swift signed his name to that
13 document --
14      UNIDENTIFIED SPEAKER: That's --
15      MR. DORSEY: -- and PAH Co. thinks --
16      UNIDENTIFIED SPEAKER: (Unintelligible
17 utterance.)
18      MR. DORSEY: And PAH Co. thinks that these
19 items are necessary to get a complete understanding --
20      THE COURT: Hold on --
21      MR. DORSEY: -- of the case --
22      THE COURT: -- stop for a moment.
23      Gentlemen, you need to know one very
24 important thing, if you speak at counsel table, it
25 will end up in the recording and in the transcript,

Page 41

1 and you need to be very careful about that.
2      UNIDENTIFIED SPEAKER:  Thank you, sir.
3      THE COURT:  Because you may -- there may be
4 things that you're discussing there, and if you speak
5 them loudly enough -- we no longer having someone
6 sitting hear transcribing who can know that she
7 shouldn't be transcribing certain things.  So be
8 careful, particularly if it's intended to be a
9 privileged communication with counsel, you don't want
10 it in the record, because they can't differentiate,
11 okay?
12      UNIDENTIFIED SPEAKER:  Thank you.
13      THE COURT:  Go ahead.
14      MR. DORSEY:  To conclude, Judge, based on
15 that response, you know, to whatever extent there was
16 a fig leaf before, where Mr. Halmos can do whatever he
17 wants individually, while Mr. Swift, you know,
18 maintains that PAH Co. is proceeding rationally, I
19 think last night's response blew that fiction out of
20 the water, and I think things have changed.
21      MR. SWIFT:  Your Honor, if I may --
22      THE COURT:  Please, go ahead.
23      MR. SWIFT:  -- respond to, frankly, an ad
24 hominem attack?
25      This was a joint response by the creditor,

Page 42

1 PAH Co., as well Peter Halmos.  It's Document No. 517.
2 It was filed last night, and it was filed about the
3 designated records, plural, as well as individually
4 acknowledging that both PAH and Peter Halmos jointly
5 filed this.  They are both responsible for the
6 drafting.
7      I believe what counsel for the debtor is
8 attempting to do is make some manner of ratification
9 argument, which is -- which is simply not true.
10      THE COURT:  Okay.  We're not going to go
11 there.  You should be careful to file things solely on
12 behalf after PAH Co. moving forward.
13      The designations filed by PAH Co. are
14 different from those filed by Mr. Halmos.
15      MR. SWIFT:  Right.
16      THE COURT:  And I think it would be wise for
17 you to only sign things on behalf of your client and
18 not have joint filings.  If you and Mr. Halmos wish to
19 coordinate and file identical things or substantially
20 identical things, go right ahead.  But that's just a
21 piece of unrequested advice --
22      MR. SWIFT:  Thank you, your Honor.
23      THE COURT:  -- okay, and we're not going to
24 go there today.
25      Yes, Mr. Halmos, please.

Page 43

1      MR. HALMOS:  Could I --
2      THE COURT:  Yes, of course.
3      MR. HALMOS:  -- just for the record, your
4 Honor.
5      As to the 523 issue that seems to be what's
6 called the catalyst for everything, well, first of
7 all, taking that out on PAH Co. is kind of a problem,
8 because PAH Co., myself, Ms. Trammel (phonetic), we
9 didn't know 523 from 727 from 9011.  So when we did
10 finally understand that your Honor doesn't like that
11 claim, that you think it's ludicrous, and then I
12 believe you issued an order suggesting that we
13 withdraw it, because we were likely to prevail on 727,
14 but unlikely on 523, we took your Honor's advice, and
15 we did withdraw it.
16      However, for the record, I believe a motion
17 was made to conform the evidence to the pleadings and
18 a motion was made to amend and add a count under
19 523(a)(2)(A)(2), that counsel determined the evidence
20 supports, and that motion was denied by your Honor.
21 So in terms of being ludicrous, perhaps had we been
22 able to amend, to conform, to the evidence it might
23 not have been ludicrous.
24      Secondly, to excoriate PAH Co. for
25 withdrawing something that your Honor suggested should

Page 44

1 be withdrawn, I think that's going a little bit too
2 far.  As for --
3      THE COURT:  Mr. Halmos, this has nothing to
4 do with today --
5      MR. HALMOS:  Well, fine, I'm just responding
6 for the record, because if I don't respond, it makes
7 it look like I agree with what's said.
8      THE COURT:  Just say that you disagree.
9      MR. HALMOS:  I disagree.
10      THE COURT:  Thank you.  That will be enough.
11      MR. HALMOS:  Thank you.
12      THE COURT:  Anything else?
13      The motion to be reconsidered will be denied.
14 There's nothing new before the Court, in my view.  I
15 think Mr. Halmos's personal notice of appeal is
16 fatally flawed.  Although I did weigh heavily on the
17 fact that -- apparently nobody sought to advise me
18 that, in fact, the notice of appeal was timely on that
19 date, and I did rely on that fact.  The substance of
20 that reliance was that Mr. Halmos's personal appeal
21 was fatally flawed, and I still believe it's fatally
22 flawed, and I suspect that Judge Marra will grant your
23 motion to dismiss his individual notice of appeal.
24 He's not directly -- although he did state on the
25 record that he's guaranteed all the obligations of PAH

11 (Pages 41 to 44)

Page 45

1 Co., that would be interesting, the -- that may just
2 be a misunderstanding of the law.
3        It seems to me that we have an order entered
4 by the court addressing two groups of parties, counsel
5 and his firm and a corporate entity.  Mr. Halmos may
6 or may not determine to continue to finance this
7 appeal effort, but with regard to the outcome, the
8 burden on Mr. Eliopoulos, the potential burden on
9 Mr. Eliopoulos, going forward, which I have no doubt
10 is very large, really nothing has changed, and I'll
11 deny the motion.
12       Let's get to the designation issues if we
13 could.  We have agreement with regard to the
14 designations filed by Mr. Mrachek and his firm, so
15 that will be addressed in an independent order,
16 correct?
17       UNIDENTIFIED SPEAKER:  Correct.
18       THE COURT:  Okay.  Let's go back to the
19 others.  I believe I have in front of me the
20 designations by Mr. Halmos himself.
21       And do I also need the ones from PAH Co.?
22       MR. DORSEY:  I think so, Judge, because
23 Mr. Halmos's designations incorporate PAH Co.'s
24 designations.
25       THE COURT:  All right.  Well, I do not

Page 46

1 currently have them, but go ahead with your
2 presentation.  If I need to, I'm going to -- oh, I
3 think I do -- I do have them, sorry.  I have Mr.
4 Halmos's designation, and I have the one by PAH Co.
5        Go ahead.
6        MR. DORSEY:  As a brief bit of background,
7 Judge, 8009 obviously vests you with the authority to
8 resolve disputes among appealing parties as to what
9 should be part of the record on appeal, if there are
10 such disputes.  I think those disputes obviously exist
11 here.
12       Really what our main problem with both the
13 PAH Co. designation and Mr. Halmos's designation, our
14 main problem are the catchalls.  Through these
15 catchall categories, you have all docket entries in
16 this case, all docket entries in the adversary
17 proceeding, and all docket entries in Eliopoulos
18 Architecture, Inc.  The appellants have managed to
19 designate, I think by my count, 800, closing in on a
20 thousand docket entries.  This is problematic on
21 several levels.
22       First of all, it goes without saying that the
23 great majority of these docket entries were not
24 considered by Judge Olson, who considered the fairly
25 discreet issue of whether Shraiberg Ferrara & Landau

Page 47

1 should be disqualified and sanctions.  Judge Olson
2 wasn't considering a certificate of service filed in
3 2012 in the Eliopoulos Architecture case, though maybe
4 Mr. Swift can explain to you in a moment why he did.
5 I don't know.  So, again, just on their face, many of
6 these items weren't considered, and I think the cases
7 we've cited are very clear that the record on appeal
8 should only consist of those items considered by the
9 Bankruptcy Court in reaching its decision.
10       Secondly, I don't speak for the clerk's
11 office, but it's my understanding that this will place
12 a substantial strain on the clerk's office.  We attach
13 an order to show cause Judge Olson entered in an
14 unrelated case, where a pro se appellant designated I
15 think about 400 items on appeal, and the clerk started
16 making noises that, you know, "My goodness, how are we
17 going to prepare and transmit all these items to the
18 District Court?"  We're talking about double that
19 number here.
20       And, in addition, what's troubling to me is
21 that some of these catchall categories appear to call
22 for the clerk to make legal conclusions on behalf of
23 appellants, and one of the catchall categories is all
24 item required by Rule 8009.  Well, you know, it's not
25 the clerk's job to teach Mr. Swift how to practice law

Page 48

1 and designate the items he should in his appeal.
2        And then, you know, Mr. Halmos's
3 designations, which were not endorsed by PAH, really
4 appear to be in the manner of discovery requests.  If
5 he thought, again, communications with state Senator
6 Negron, just to pull a name out of a hat, were
7 relevant to the disqualification motion or to the
8 sanctions motions, I suppose he could have tried to
9 take discovery on those issues.  He didn't.  That door
10 is now closed, and it's too late to start taking
11 discovery on appeal.
12       Because the designations are so flawed, I
13 really don't think this is a situation like we had
14 with the Mrachek designation, where you can just
15 strike off one or two items and obviously the parties
16 are in accord going forward -- your Honor hinted
17 before that maybe we're going to go through the
18 dockets of all the cases today.  I suppose that's one
19 option.  Another option would be to strike the
20 designations entirely and request amended designations
21 be filed.
22       We attached Judge Olson's order to show
23 cause, which might be a template in that the
24 respondent -- excuse me, the appellants are required
25 to appear again in a week or two with a new

Page 49

1 designation and explain why each item is relevant.
2 I'm, frankly, open to ideas, because I've never seen
3 an appellant designation like this.
4        THE COURT:  Whichever one of you would like
5 to go.
6        MR. SWIFT:  He was just speaking about, I
7 believe, in large part Mr. Halmos's designations, and
8 so maybe Mr. Halmos will start and then --
9        THE COURT:  Well, it's aimed at --
10        MR. SWIFT:  -- PAH can respond.
11        THE COURT:  -- the PAH Co. ones as well.
12        MR. SWIFT:  Well, respectfully, aside from
13 the ad hominem attack, which is becoming,
14 unfortunately, a pattern and practice from the other
15 side, I don't appreciate them saying the clerk is
16 going to teach me how to practice law.  The majority
17 designates both the docket entry number, as well the
18 entire text.
19        The catchall categories is something I
20 believe the debtor for counsel's designations also
21 has, as far as large catchalls.
22        This, as the Court I'm sure saw in the joint
23 response filed at Docket Entry 517, when --
24        MR. DORSEY:  Your Honor, should Mr. Swift be
25 at the podium for the --

Page 50

1        THE COURT:  Oh, that would be --
2        MR. DORSEY:  -- transcript?
3        THE COURT:  -- helpful.
4        MR. SWIFT:  Sure.
5        THE COURT:  I -- primarily because I'm
6 concerned that you might not be reflected fully in the
7 record.  Those microphones are pretty good, but one
8 never knows.
9        MR. SWIFT:  First as a -- oh, that's much
10 louder.  First as a preliminary matter, it's been
11 pointed out to me that there is a scrivener's error in
12 the wherefore clause of the joint response and that
13 omitted Peter Halmos.  So just for record purposes,
14 his name should be included in the wherefore clause --
15        THE COURT:  Oh, that's fine.
16        MR. SWIFT:  -- of Document 517.
17        The issue that we have on appeal, and the
18 Court directly addressed it before, it seems counsel
19 for debtor has addressed as well, we've heard a lot
20 about PAH's alleged conduct.  We've heard a lot about
21 PAH's general litigation strategies, and to me --
22        THE COURT:  That's not -- well, I don't know.
23 Is that going to be an issue on appeal?
24        MR. SWIFT:  Well, it seems that it's been a
25 very large part of the argument in procuring the

Page 51

1 sanction award.  And as a result of that --
2        THE COURT:  I've read the order.  The order
3 seems to be focused on the evidence, specific
4 conclusions from the evidence.
5        MR. SWIFT:  I believe in the order there is
6 several references to or direct statements about PAH's
7 litigation strategy, Mr. Halmos himself, all sort
8 things that seem based, at least partially, in
9 argument, because ultimately what we are dealing with
10 is an opinion, not a fact, and when it is an opinion,
11 there is at least some argument that is the basis for
12 this opinion being reached.
13        As result of that, it seems that the
14 reviewing court is unfortunately left with a situation
15 where there needs to be a large amount of education
16 for -- and the quote from the cases cited in the
17 response is "complete understanding of the case."
18 When there is such a necessity to give the reviewing
19 court a complete understanding of the case, and it's
20 an expansion of the record as possible, that's at
21 least partially --
22        THE COURT:  Hold on.
23        MR. SWIFT:  Yes.
24        THE COURT:  The case here is a discreet
25 matter heard -- the only matter in the case heard by

Page 52

1 the judge who entered the order.
2        Are you suggesting that Judge Olson has read
3 all this stuff that exists in the Eliopoulos case, the
4 Eliopoulos Architecture case?
5        MR. SWIFT:  Well, no, your Honor, I'm not
6 jumping inside the judge's head.  I'm not offering any
7 opinions as to what he considered.  But the case law
8 cited, which is In Re: Candor Diamond Corp., and
9 that's at 26 B.R. 844, In Re: Food Fair, Inc., which
10 is at 15 B.R. 569, and In Re: -- I'm going to butcher
11 the pronunciation of this Chatoo Guy (phonetic) Corp.,
12 et al.
13        THE COURT:  No, it's Shadow Gay (phonetic) --
14        MR. SWIFT:  Shatto Gay (phonetic) Corp. --
15        THE COURT:  Yeah.
16        MR. SWIFT:  -- et al., at 64 B.R. 990, all of
17 those stand for the proposition that the record can
18 include more than what the judge considered when it's
19 necessary to give the reviewing court a complete
20 understanding of the case.  As it seems has been a
21 recurring issue, PAH's alleged conduct is something
22 that is at least considered in this sanction
23 procurement.  We're talking about --
24        THE COURT:  Is that really true?  I mean, it
25 was relevant to what I heard earlier today, which I've

13 (Pages 49 to 52)

Page 53

1 denied the motion to reconsider --
2      MR. SWIFT:  Mm-hmm, I --
3      THE COURT:  -- I don't know if you noticed
4 that part, you actually won.
5      MR. SWIFT:  Yes.
6      THE COURT:  But it was relevant today because
7 one of things being argued, and I think the Tribune
8 case is an appropriate consideration, although this is
9 not a confirmation order, is the harm, not damage in
10 the usual legal sense, and so I'm able to consider
11 whether someone will make the process expensive.
12 That's my view.
13      But this is the District Court ruling as the
14 appeals court in connection with an order denying the
15 motion to disqualify a particular law firm and then
16 awarding sanctions, and you're saying they need to
17 know about the Eliopoulos Architecture case, every
18 document filed in Mr. Eliopoulos's bankruptcy case.
19 Maybe, and I'm not suggesting that I would agree with
20 this, but maybe if I was the person who entered the
21 order and I had the whole history of the case in mind,
22 maybe you'd have a better argument.  But this is a
23 matter sent to Judge Olson, not because of anything in
24 the case, other than the fact that two of my former
25 law clerks testified at the hearing, correct?  I was

Page 54

1 not going to be in a position to rule on their
2 credibility.  Whether I felt I could do it or not,
3 that was not appropriate.  So off the matter goes, but
4 --
5      MR. SWIFT:  Well, so --
6      THE COURT:  -- he only hears one matter, and
7 can you explain to me how it's necessary for all of
8 these other documents?
9      MR. SWIFT:  Your Honor, I would humbly
10 suggest that we're losing sight of the issue, which is
11 the case law cited, which we previously stated on the
12 record, states it's not a matter of consideration.
13 It's a matter of giving a complete understanding of
14 the case --
15      THE COURT:  Right --
16      MR. SWIFT:  -- to the reviewing court.
17      THE COURT:  -- the case.
18      MR. SWIFT:  And a complete understanding of
19 the case, in my opinion, based on reading the
20 sanctions order, which is, unfortunately, not in front
21 of me, deals with opinions as to PAH's -- I believe
22 the term was vexatious conduct.  That's -- that's a
23 very strong opinion --
24      THE COURT:  Okay.
25      MR. SWIFT:  -- and how we reached that --

Page 55

1      THE COURT:  Let's say that there's an order
2 entered that makes that finding -- let's ignore Judge
3 Olson's order for a moment, okay -- and it says that
4 there was vexatious conduct and a party has acted
5 consistently with that, right?
6      MR. SWIFT:  Mm-hmm.
7      THE COURT:  If that requires consideration of
8 something not admitted, then there's potentially an
9 appealable issue, right?  So the Court is supposed to
10 consider what was admitted during the evidentiary
11 hearing.  There was an evidentiary hearing.  Evidence
12 was admitted.  Maybe Judge Olson watched some people
13 testify and read some documents that were admitted and
14 concluded that there was an attitude.  I don't know.
15      MR. SWIFT:  And be that as it may, I'm not
16 Judge Olson, so I can't speak to what he considered.
17 The only evidentiary hearing I'm aware of occurring
18 was on the motion to disqualify.
19      THE COURT:  Okay.
20      MR. SWIFT:  And so the sanctions order, which
21 is ultimately the nut of what's being appealed here
22 did not have an evidentiary hearing.  And so I believe
23 your Honor --
24      THE COURT:  It incorporated the entire order
25 that preceded it.  The whole point was to determine --

Page 56

1 he had already heard the evidence.
2      MR. SWIFT:  He also --
3      THE COURT:  Sanctions was just about amount,
4 wasn't it?  He said, "There will be sanctions.  Now, I
5 will determine the amount that is reasonable."
6      MR. SWIFT:  Well, I believe the determination
7 of the amount that was reasonable, though, did include
8 reference to all of these things, which --
9      THE COURT:  Things which were not in the
10 record, you're saying?
11      UNIDENTIFIED SPEAKER:  Jesus.
12      MR. SWIFT:  I don't know if they were in
13 record.  I don't know what it was that Judge Olson
14 specifically considered, but these -- these -- these
15 comments that he made did speak to fairly strong
16 opinions, not citing, you know, to page and line of a
17 basic fact that was considered --
18      THE COURT:  Let me tell you, one can get --
19 I've been here for only 7-1/2 years.  Judge Olson two
20 or three years more than me, and he's a little bit
21 older than I am, so he's been practicing for awhile
22 longer.  One can quickly get an impression of the
23 litigiousness of a party, particularly when their
24 principal is testifying.
25      Do you really need to read everything in the

14 (Pages 53 to 56)

Page 57

1 entire record?  And I find it highly unlikely that he,
2 A, read the entire record of either of those cases,
3 or, B, did so without actually saying, "I've reviewed
4 the record of these entire cases," which by the way
5 we're not supposed to do without referring to it,
6 because if it's evidence, then people get the
7 opportunity to counter it.
8      MR. SWIFT:  But these cases cited are not out
9 of left field.  It's the same parties, PAH and
10 Mr. Eliopoulos, there are statements made by those
11 parties under oath, statements that could be relevant
12 to the arguments raised on appeal.
13      THE COURT:  And if they could have been
14 relevant, they should have been raised in the context
15 of the evidentiary hearing that resulted in the order
16 that you're appealing from, and not afterwards.  And
17 the whole point of the record on appeal is to say,
18 "This is what was considered, appeals court, please
19 look at this."  If things were considered outside of
20 that, then you make the argument that non-evidence was
21 considered, but you don't call in every single
22 document from an entire Chapter 11 case, or 7, as it
23 is now, and another bankruptcy case for that matter.
24      MR. SWIFT:  Well, your Honor, I believe --
25 and maybe the Court understands and just disagrees

Page 58

1 with my position, the standard about the appellant
2 compiling the record --
3      THE COURT:  Let me explain to you, I
4 understand that case law.
5      MR. SWIFT:  Yes.
6      THE COURT:  You are applying it in a context
7 for which is not intended.  Understanding "the case,"
8 means the matter under appeal.  The decision under
9 appeal, based on the evidence that was presented to
10 the court.  What was and was not presented is what's
11 important.  It's a capsule.  You look at the capsule.
12      When I make a decision on a valuation hearing
13 in a Chapter 11 or even a Chapter 7 case, the notice
14 of appeal does not say, the court should -- the
15 appeals court should consider all these other things,
16 which were not presented at the trial court and may
17 not be relevant at all.  Those don't go up on appeal.
18 We don't send up everything that's ever been penned in
19 connection with a case.
20      That case law does not stand for, "Know
21 everything about the bankruptcy case, Appeals Court."
22 It is about the matter before the Court, that's what
23 they mean by "the case."  And here the matter before
24 the Court was a motion to disqualify counsel and the
25 resulting sanctions, it's a mere image of the

Page 59

1 motion -- really, the motions were very much opposite
2 sides of a coin.
3      MR. SWIFT:  Well, your Honor --
4      THE COURT:  Now, what I want to know is what
5 the correct procedure for dealing with this is, and
6 Mr. Dorsey has suggested a procedure, which is
7 essentially wipe the slate clean and give you and
8 Mr. Halmos a chance to rebuild it.
9      The other procedure is, I can go through the
10 items.  I know there's a hundred and some odd -- they
11 go on for many pages.  I mean, I think the PAH one is
12 18 pages.  Go through them one at a time.  I can do
13 that.  I can do it now.  I can do it on another day if
14 you prefer.  You've all been here a very long time.
15 I'm glad to do that if that's the appropriate thing.
16      There are a number of items which are not
17 appropriately designated in each of these.  I think
18 there are more items in Mr. Halmos's designation which
19 are suspect than in PAH's.  I think what happened with
20 PAH is a great number of them were taken directly from
21 Mr. Mrachek's designation.
22      I am willing to do it either way, whatever
23 you think is most appropriate from your point of view,
24 because it is your client, and Mr. Halmos gets to
25 speak for himself, obviously.

Page 60

1      MR. SWIFT:  Without -- may I --
2      THE COURT:  You can go -- please.  And
3 remember the microphone.
4      (Inaudible discussion off the record.)
5      MR. SWIFT:  Your Honor, what Mr. Halmos has
6 suggested, he's apparently been working on amended
7 supplemental designation of the issues and record on
8 appeal for --
9      THE COURT:  Well, that's another matter,
10 because there's a request to supplement.
11      MR. SWIFT:  Correct.
12      And so responding to the Court's question
13 from a moment ago, Mr. Halmos has something that he
14 himself is prepared to file.
15      THE COURT:  It's different or in addition to
16 what's already been filed?
17      Is it meant to replace what's already been
18 filed, or --
19      UNIDENTIFIED SPEAKER:  Yes.
20      THE COURT:  -- add on to it?
21      UNIDENTIFIED SPEAKER:  Replace.
22      THE COURT:  And does it add things not
23 currently listed.
24      UNIDENTIFIED SPEAKER:  I can't tell you
25 exactly that.

15 (Pages 57 to 60)

Page 61

1    THE COURT: Okay. Because there is a motion
2 to supplement, which I need to hear independently.
3    UNIDENTIFIED SPEAKER: Okay.
4    THE COURT: And if I deny that, you can't add
5 anything, it can only be what we have or less.
6    MR. SWIFT: And speaking for PAH, and PAH's
7 preference --
8    MR. HALMOS: I need my turn to speak too.
9    MR. SWIFT: I've been here almost five hours,
10 and as pleasant as your Honor's company is --
11    THE COURT: Well, let me just let you in on
12 the fact that during those five hours, I have sat up
13 here and heard dozens of matters for which I prepared
14 ahead of time, so I have very little sympathy. I'm
15 sorry you had to wait, but I knew that this matter
16 would take more time than any other matter on the
17 docket.
18    And I don't know if you noticed this, but the
19 notice of hearing actually said if you require more
20 than the allotted amount of time, you should call and
21 ask for a special setting, which didn't happen. And
22 so I am going to sit here, if necessary, and deal with
23 it, or we may set it at another time.
24    MR. SWIFT: Well, what I was suggesting was
25 perhaps the third option your Honor offered, which is

Page 62

1 going through, correcting the issues as far as all the
2 catchalls go, designating individually and refiling,
3 and if there's still an issue, then we can come back
4 before your Honor. I would say, candidly, I hope
5 there isn't an issue, because if the catchall, as
6 Mr. Dorsey indicated, was his big problem with PAH's,
7 we can correct that.
8    THE COURT: Well, there's also. Mr Halmos,
9 but you -- just to make it apparent, what happens with
10 the clerk, because the designation -- usually I don't
11 see designations of items on appeal. They are
12 tendered. The clerk compiles the record, and the
13 clerk needs to be able to do this. If there's a
14 transcript, the party requesting it has to order it,
15 and once it's available, the clerk puts it in. All
16 the other items are usually evidence that's been
17 offered, which, of course, the court has in one form
18 or another, usually documents but sometimes computer
19 disks or the like -- I'm dating myself -- CDs, thumb
20 drives, and items from the record designated by docket
21 number.
22    The clerk does not decide anything at all,
23 and so we can't have any item that the clerk can't
24 look at and know, "Docket 177 in this case, great,"
25 and that's it. They can't make a decision. They are

Page 63

1 not permitted to make a decision. So anything that
2 says something that's open ended, it cannot be in the
3 designation of record on appeal.
4    Also, and I'll tell Mr. Halmos this ahead of
5 time, you can't designate things on appeal that would
6 require a separate evidentiary hearing to determine
7 what they are, who has them. That's not how the
8 notice of appeal works.
9    And so the clerk, again, needs to be able to
10 do this as a purely administrative matter. It doesn't
11 involve -- it's not supposed to involve court
12 intervention.
13    Now, with regard to the PAH Co. designation,
14 which I have in front of me, is it catchalls, or is it
15 other things?
16    I think it -- why I hesitate here is that I
17 have a funny feeling that what you might do is go and
18 simply list every docket entry in the Eliopoulos case,
19 and we'll be back right where we are.
20    MR. SWIFT: Judge, that's not my intention,
21 your Honor.
22    THE COURT: Okay. So is it useful to have
23 them file a new designation?
24    MR. DORSEY: (Inaudible.)
25    THE COURT: That was one of your suggestions.

Page 64

1 Then we'll deal with Mr. Halmos.
2    MR. DORSEY: Correct, Judge. I mean, I agree
3 with Mr. Swift in a sense. We've all been here for
4 awhile, and maybe it's -- on the one hand I can
5 sympathize with the idea of looking at this with a
6 fresh set of eyes, but I strongly suspect we're going
7 to be here again if they're allowed to file amended
8 designations.
9    And Mr. Swift just had a comment that was
10 mind blowing to me. He said, quote, "I don't know
11 what he considered," referring to Judge Olson.
12 Really? In a hearing on a motion to strike record
13 designations on Judge Olson's orders, you don't know
14 what he considered?
15    THE COURT: His suggestion -- what he's
16 suggesting by that, in a back-handed way, is that
17 Judge Olson considered things not in the record
18 somehow, which can itself be the subject of appeal,
19 but we don't get to guess that every other item in the
20 universe was considered and ask the District Court to
21 look at every other item in the universe and guess
22 what Judge Olson did or did not look at. That is not
23 how appeals work.
24    MR. DORSEY: It seems to me we have two
25 choices, and neither one seems very appealing at the

16 (Pages 61 to 64)

1 moment.  The first one is to sit here and go through
2 the record, which I'm happy to do.  The second one is
3 to give Mr. Halmos and PAH time to file amended
4 designations with the very high probability, in my
5 view, we'll be here again.
6         THE COURT:  Gentlemen, I am -- Mr. Halmos
7 hasn't gotten to speak on this yet.  I honestly will
8 do whatever you all think is the best approach to
9 this.  I -- and I'm going to give a good deal of
10 weight to what Mr. Halmos and counsel for PAH wish to
11 do, because it's their designations, and so whatever
12 they think is the best use of time.  I'm here now and
13 I can be here another day, or I can wait until new
14 designations are recorded.  That's my job, so --
15         MR. DORSEY:  Would you maybe want to take a
16 break for two minutes, so I can talk to Mr. Swift and
17 Mr. Halmos?
18         THE COURT:  That's fine with me if you think
19 it would be helpful, gentlemen.
20         Yes.
21         MR. HALMOS:  I would like to have my say for
22 the record first.
23         THE COURT:  Well, then stand up and go to the
24 podium.
25         MR. HALMOS:  I'm sorry, and then we can

1 certainly talk.
2         In the motion that I filed asking for a
3 continuance, which I think your Honor is granting --
4         THE COURT:  I think I denied --
5         MR. HALMOS:  Well --
6         THE COURT:  -- but I did continue the matter.
7         MR. HALMOS:  -- it rolled over, however it
8 happened --
9         THE COURT:  Correct.
10         MR. HALMOS:  -- I thought I made very clear
11 my intent to take the motion to strike to heart, had
12 we been able to talk about it before it was filed, we
13 might have eliminated a lot of this, and wanted to
14 file amended designations seeking to -- to the extent
15 possible address the issues in the motion, which I
16 have substantially done, and I could either file
17 these, or if I could have a couple extra days, based
18 on what I heard today, I think I can even comply
19 further.
20         However, just for the record, what happened
21 is, Judge Olson held an evidentiary hearing on whether
22 or not to disqualify, and there was a decision on
23 that.  That was on December 18, 2-0-1-4.  On February
24 26, 2-0-1-5, there was a non-evidentiary hearing on
25 sanctions.  Sanctions were not discussed in the

1 December 18 hearing.
2         And the record on what Judge Olson was
3 presented orally on February 26, 2-0-1-5, as well in
4 papers filed, none of which is in evidence, but that's
5 what he considered in the sanctions decision, so
6 everything that was said, and just a guess, I would
7 say 98% of it was not in the record --
8         THE COURT:  Can you explain what you just
9 meant.  Everything was said was not in the record,
10 what does that mean?
11         MR. HALMOS:  If there was an evidentiary
12 hearing, if I understand what evidence means, is what
13 people testify to or what documents are admitted into
14 evidence, not what lawyers say about the evidence.
15 Now, I could be wrong about that.
16         So if you look at what the evidence is for
17 the December 18, 2-0-1-4 hearing, and then you look at
18 what the lawyers told Judge Olson on February 26, as
19 to why he should sanction, there's not much relevance
20 or practically nothing that was said as to the
21 sanctions order, as to the sanctions issues, in the
22 record from December 18th.
23         I have a lot of it here, and I could read
24 some to you if you'd like, but it covers the
25 waterfront from the vendetta to -- to taking orders or

1 things out of other cases.  I've got -- and I tried to
2 eliminate the back and forth and crystallize the
3 material issues discussed, I've got a hundred pages of
4 smears, of -- that's what -- that's how they procured
5 the sanctions order.  Then the amount, there wasn't
6 even a hearing on that.
7         So as to the sanctions, what Judge Olson
8 heard is reflected in the record on February 26,
9 2-0-1-5, as well the papers filed for that hearing,
10 the opening statements and so on and so forth.  That's
11 what he considered in determining whether or not there
12 should be sanctions.
13         Now, to appeal the sanctions order, we have
14 to be able to respond to everything that was said and
15 we have the similar situation --
16         THE COURT:  Stop for a moment.
17         MR. HALMOS:  I'm sorry.
18         THE COURT:  Stop, stop.
19         MR. HALMOS:  I'm sorry.
20         THE COURT:  You mean as a substantive matter,
21 you'd like --
22         MR. HALMOS:  Substan --
23         THE COURT:  -- hold on -- you'd like the
24 District Court to consider stuff that was not formally
25 in the record in connection with the sanctions motion?

17 (Pages 65 to 68)

Page 69

1        MR. HALMOS:  I think the District Court
2 should know what was told to Judge Olson on February
3 26, 2-0-1-5 verbally and in the papers filed for that
4 hearing, based upon which Judge Olson decided there
5 should be sanctions.  That's the decision Judge Olson
6 made based upon the hearing he held for that purpose,
7 which was not evidentiary.
8        And I've read that.  I've read the
9 transcript.  I know what was said, and -- first of
10 all, as Mr. Mrachek said at that hearing, that the
11 vast majority has nothing to do with the record and
12 none of this would ever even make it into a record in
13 a court of law.  That's what he said.  Now, that's
14 him.  So he's been practicing for 40 years.
15        Now, I'm in the position where most of what
16 was said was directed at me, and the appellate court
17 has to know what was presented to Judge Olson for
18 Judge Olson to decide, "We're going to sanction," and
19 what the opposition is trying to do is limit the
20 record, so that we can't present that, and I just
21 think that is patently unfair.
22        So when things are said about Mr. Negron,
23 well, if you read the motion I filed asking for the
24 continuance and the exhibits, I made clear where that
25 comes from and why.  You talk about Judge Stettin, I

Page 70

1 mention it factually in the motion.  I attach exhibits
2 that clearly show there's a direct relevance.
3        THE COURT:  Can you explain that?
4        MR. HALMOS:  Well, for example -- I don't
5 have the exhibits here, but Judge Stettin has the
6 Rothstein case there in Fort Lauderdale, and one of
7 the creditors is AmericanExpress, with whom I have had
8 a relationship with in the past, and -- and Judge
9 Stettin wanted to hold an arbitration with
10 AmericanExpress.  I don't know the details.  But Judge
11 Stettin named three potential arbitrators that he
12 would like to have decide this, Judge Olson, Judge
13 Kimball, and Judge Hyman.
14        THE COURT:  Hmm, I wasn't aware of that.
15        MR. HALMOS:  Yeah, well, if you'd --
16        THE COURT:  But what does that have to do
17 with this case?
18        MR. HALMOS:  Well, if you would have read my
19 motion and --
20        THE COURT:  I did.
21        MR. HALMOS:  Well, I don't --
22        THE COURT:  I'm trying to figure out what it
23 has to do with this case.  What -- what does Herb
24 Stettin --
25        MR. HALMOS:  Herb Stettin --

Page 71

1        THE COURT:  -- in this other case have to --
2        MR. HALMOS:  -- has --
3        THE COURT:  -- do with -- hold on -- have to
4 do with appeals from an order denying a motion to
5 disqualify and an order awarding sanctions?
6        MR. HALMOS:  Because there has -- has been a
7 history of Judge Stettin interfering in other cases.
8        THE COURT:  Judge Stettin is -- former Judge
9 Stettin is interfering in this case somehow?
10        MR. HALMOS:  I didn't say he's interfering in
11 this case.  I said it's --
12        THE COURT:  You should know that I've never
13 met him.
14        MR. HALMOS:  -- possible.
15        The COURT:  So I wouldn't --
16        MR. HALMOS:  I don't know if you met him or
17 not.
18        THE COURT:  -- know what he looked like,
19 but -- but -- I only know him by name.  But what does
20 that have to do with the Eliopoulos case?  That's like
21 saying Martians have come down and interfered --
22        MR. HALMOS:  Okay --
23        THE COURT:  -- with the evidence secretly.
24        MR. HALMOS:  -- I'm not saying that.
25        THE COURT:  Well, it's quite close.  I'm

Page 72

1 trying to figure out, I mean --
2        MR. HALMOS:  I'll stick with my papers --
3        THE COURT:  -- there's Senator Negron, I
4 mean, what does Senator Negron have --
5        MR. HALMOS:  Okay.  Since --
6        THE COURT:  -- possibly, to do with this
7 little bankruptcy case.
8        MR. HALMOS:  Because Gunster Yoakley
9 represents Weekes & Callaway.
10        THE COURT:  Gunster Yoakley -- Weekes &
11 Callaway is a broker?
12        MR. HALMOS:  That's the lawsuit the trustee
13 filed to -- against Weekes & Callaway.
14        THE COURT:  Okay.
15        MR. HALMOS:  There's documents --
16        THE COURT:  Just remind me, who is Weekes &
17 Callaway in this case?  They're a broker?
18        MR. HALMOS:  Weekes & Callaway --
19        THE COURT:  -- right?
20        MR. HALMOS:  -- is Eliopoulos's insurance
21 agent.
22        THE COURT:  Right, right, right, their
23 insurance broker, correct?  Don't they -- right?
24        MR. HALMOS:  And PAH Co. --
25        THE COURT:  Or a potential defendant, right?

18 (Pages 69 to 72)

Page 73

1      UNIDENTIFIED SPEAKER:  Defendant.
2      THE COURT:  Didn't PAH Co. have potential
3 claims against Weekes & Callaway, allegedly?
4      MR. HALMOS:  Yes, and --
5      THE COURT:  Okay.
6      MR. HALMOS:  And --
7      THE COURT:  They refused coverage.  They said
8 there was not coverage for a claim.
9      MR. HALMOS:  It's much more complicated than
10 that.  It's in the complaint.
11     THE COURT:  All right.  Well, I don't
12 remember the whole thing.
13     MR. HALMOS:  So, anyway, let's get back to
14 Mr. Negron.  There's documents that Mr. Eliopoulos was
15 communicating with Gunster Yoakley and the two Gunster
16 Yoakley people Mr. Negron use -- used in another case,
17 as his front people, are on the service list for this
18 case.
19     THE COURT:  Okay.
20     MR. HALMOS:  And I have had situations where
21 Mr. Negron has interfered, so --
22     THE COURT:  So your suspicion is that
23 Mr. Negron has somehow interfered in this case, and
24 that brought out a negative outcome on the sanctions
25 motion or disqualification motion or both.

Page 74

1      MR. HALMOS:  Well, something -- clearly
2 something is very much amiss with the sanctions
3 hearings and the decision, because there is nothing in
4 the record that supports any of it, and beyond that,
5 these -- these -- I don't know what you want to call
6 them, these slurs and these conclusions -- you know,
7 there is no evidence of a vendetta.  That might be
8 your conclusion from what the lawyers say, what
9 Mr. Eliopoulos says.  But I have evidence showing
10 that's not even true, but why should we even waste
11 time trying to defend against that in the 523 case --
12 I mean, it's just ludicrous.  It's ludicrous.
13     THE COURT:  Yes, that was the word that I
14 used actually.
15     MR. HALMOS:  As to 523 --
16     THE COURT:  Yeah, I would say as to most of
17 that trial, it was actually quite amazing, but --
18     MR. HALMOS:  I --
19     THE COURT:  -- anyway we don't need to go
20 there, since Judge Olson did not have any knowledge of
21 that trial as far as I know.
22     MR. HALMOS:  But that's not what these
23 lawyers told Judge Olson.
24     THE COURT:  So you're assuming that Judge
25 Olson was swayed by argument, not supported by the

Page 75

1 evidence?
2      MR. HALMOS:  I'm telling -- I'm saying for
3 the record that if you look at the --
4      THE COURT:  Can I ask you a very important
5 question?
6      MR. HALMOS:  Sure.
7      THE COURT:  Because I know you don't practice
8 law.
9      MR. HALMOS:  That's for sure.
10     THE COURT:  What was the time period between
11 the hearing in December of 2014 and the entry of an
12 order?  Does anybody remember?
13     MR. HALMOS:  I think the December 18 order --
14     THE COURT:  Oh, that was an order.
15     MR. HALMOS:  -- came --
16     THE COURT:  What was the time period between
17 the evidentiary hearing and the order?
18     MR. HALMOS:  And the order on
19 disqualification?
20     THE COURT:  Correct.
21     MR. HALMOS:  I think that was soon -- if I
22 remember, your Honor entered that order --
23     THE COURT:  No, I did not.
24     MR. DORSEY:  The order was entered five days
25 later, I think, on December 23rd.

Page 76

1      THE COURT:  Okay.
2      MR. DORSEY:  It was a two-line order that
3 incorporated oral findings.
4      THE COURT:  Oh, I see, okay.  So there was a
5 ruling at the end.
6      MR. DORSEY:  Yes.
7      THE COURT:  Okay.
8      MR. HALMOS:  And I think your Honor
9 incorporated the findings of fact and conclusions of
10 law.
11     THE COURT:  I did no such thing.  I have not
12 entered any --
13     MR. HALMOS:  Can we get the order?
14 Because --
15     THE COURT:  Mr. Halmos, I promise you --
16     MR. HALMOS:  I could be wrong.
17     THE COURT:  -- my signature is not on any
18 order in connection with disqualification or
19 sanctions.
20     MR. HALMOS:  Okay.
21     THE COURT:  In fact --
22     MR. HALMOS:  I'm wrong.
23     THE COURT:  -- I didn't even know about it
24 until after the fact --
25     MR. HALMOS:  I'm wrong, I apologize.  Let's

19 (Pages 73 to 76)

Page 77

1 not even waste time on it.
2        THE COURT:  Okay.  Just so you know, I have
3 reviewed the transcript of February 26, 2015 --
4        MR. HALMOS:  Mm-hmm.
5        THE COURT:  -- which is the hearing which was
6 originally scheduled as an evidentiary hearing, and
7 then pursuant to agreed order, agreed order, which
8 means your counsel -- your company's counsel agreed to
9 it, agreed order entered January 20, 2015, was changed
10 to a non-evidentiary hearing, and at which Judge Olson
11 began the hearing, referencing the fact that he had
12 reviewed the evidence taken the prior month in
13 connection with disqualification, and everyone argued
14 as though that was the evidence presented in
15 connection with the sanctions motion --
16        MR. HALMOS:  (Laughs.)
17        THE COURT:  -- including your own counsel --
18 I might point out that your former counsel in the
19 matter is one of the best regarded trial lawyers in
20 Florida --
21        MR. HALMOS:  And he said, your Honor -- he
22 said that almost everything at that hearing is not in
23 the record and would never even get into a record.
24        THE COURT:  Fantastic.  Well, if that's the
25 case and it appears that it was relied upon

Page 78

1 improperly, you may argue that in connection with the
2 appeal.  But that does not mean that you get to guess
3 what the trial court might have considered in
4 connection with the appeal, and then designate all
5 such things in the notice of -- okay.  This is what
6 we're going to do.  You can do it now or on another
7 day.
8        We are not filing new documents.  I am going
9 to go through every single paragraph one at a time.
10 We can begin now and go for a couple hours, and then
11 go on to another day, or we can start it anew another
12 day.  It's up to the three of you.
13        I'll be taking a five-minute recess.  When I
14 come back, I want to know whether I'm beginning right
15 now or whether I'm rescheduling to another day, which
16 will be very soon, okay?
17        All right.  That's it.  Court's in recess.
18        (Thereupon, a brief recess was taken.)
19        THE COURT:  Thank you.  We're back on record
20 in Eliopoulos.
21        UNIDENTIFIED SPEAKER:  Excuse me just a
22 moment, please.
23        THE COURT:  Gentlemen.
24        MR. HALMOS:  Your Honor, I don't mean to be
25 offensive whatsoever, I'm just am really tired of

Page 79

1 being called a liar.  If you'll look at Docket Entry
2 324, that's the order your Honor signed on
3 disqualification.
4        THE COURT:  Is this an order on the
5 disqualification motion?
6        MR. DORSEY:  It appears to be, Judge.  I
7 don't have it up on my computer, but I looked at
8 Mr. Halmos's.
9        MR. HALMOS:  It's a small -- it's a
10 non-issue.
11        THE COURT:  No, it's not, because I did not
12 sign any order on the motion to disqualify.
13        Three twenty-five?  It can't be 325.
14        UNIDENTIFIED SPEAKER:  Four.
15        THE COURT:  Oh.  I have no idea why my
16 signature is on that, but I did not cause it to be
17 signed, which means somebody clicked the mouse on my
18 behalf.
19        MR. HALMOS:  Well, I just --
20        THE COURT:  That's very strange, Cindy --
21        MR. HALMOS:  -- want your Honor to know --
22        THE COURT:  No, hold on a moment, just wait a
23 minute.
24        MR. HALMOS:  -- that I don't say things -- I
25 may make a mistake --

Page 80

1        THE COURT:  Hold on, I just want to ask --
2        MR. HALMOS:  -- but --
3        THE COURT:  Can you just let me speak?
4        MR. HALMOS:  Sorry, sir.
5        THE COURT:  Cindy, when we get matters from
6 another judge, don't I cause my own signature to go on
7 it?
8        MS. KLOPP:  When you get a --
9        THE COURT:  Like if I get something from
10 Judge Hyman's case, don't I -- I sign it with my own
11 signature, right?
12        MS. KLOPP:  We do, but it's --
13        THE COURT:  That's weird.
14        MS. KLOPP:  -- hand signed, because --
15        THE COURT:  Well, this is my electronic
16 signature.
17        MS. KLOPP:  Let me see.  I'll trace it.
18        THE COURT:  Anyway, well, thank you,
19 Mr. Halmos.  I appreciate it.
20        Just so that you all know, I had nothing to
21 do with signing that order.
22        UNIDENTIFIED SPEAKER:  Your Honor, we've --
23        THE COURT:  It remains the order of the court
24 however.
25        Yes.

20 (Pages 77 to 80)

Page 81

1      UNIDENTIFIED SPEAKER:  Your Honor, we've had
2 a chance to discuss.  We've a bit of a disagreement.
3 My preference would be, and I know the Court recently
4 indicated it's not an option, would be the clean
5 slate, refile to --
6      THE COURT:  I don't intend to do that.
7      UNIDENTIFIED SPEAKER:  -- correct the issues.
8      Failing that, given that it is --
9      THE COURT:  Let me explain to you why I don't
10 want to do that.
11      UNIDENTIFIED SPEAKER:  Yes.
12      THE COURT:  I'm concerned that we'll be in
13 the position of dealing with a motion I've not yet
14 heard, which is for more time to add other things to
15 the record, and then we'll need to -- because these
16 things are 38, 40 pages long, then I'll have arguments
17 that this is new, this was not in the original filed.
18 I don't want that.
19      UNIDENTIFIED SPEAKER:  Okay.
20      THE COURT:  Now, if it turns out that there
21 is some, for example, catchall that includes a whole
22 bunch of things, and really some of them should be
23 included, well, in my view they have already been
24 included and you get to leave them there and other
25 things are left out.  But I don't want to get into the

Page 82

1 argument in such an enormous document that something
2 was added.  I don't want anybody to have to figure out
3 what's new, okay?  So we're not going to do that.
4      MR. SWIFT:  Your Honor, my preference -- and
5 this is Trent Swift on behalf of PAH Co., and I
6 apologize -- would be to come back as your Honor
7 indicated in very short order.  That extra time --
8 since it is late in the day, it's unlikely we'd finish
9 today going through everything.  That extra time could
10 be used to, perhaps, come to an agreement as to things
11 that can be removed without even needing to take the
12 Court's time, and we can work, perhaps, more
13 expeditiously in a few days when we're back in front
14 of your Honor.
15      THE COURT:  That's fine with me.
16      You want to start right now, I take it?
17      MR. DORSEY:  Correct, Judge.  I mean --
18      THE COURT:  You know that there's no way
19 we'll complete it today.  I'm glad to do it, but I did
20 say that I would give weight to the parties whose
21 notices they are of the designations.
22      MR. DORSEY:  Nine times out of ten I would
23 agree with Mr. Swift.  I just think there are some
24 fundamental disagreements here between the parties
25 about what belongs in the record, and it's not going

Page 83

1 to be a pleasant process, but we're all here, and I
2 think we should just --
3      THE COURT:  But we'll never --
4      MR. DORSEY:  -- get started.
5      THE COURT:  -- get through all of it.  It's
6 just impossible.
7      MR. DORSEY:  Well, I --
8      THE COURT:  And if there's any chance that
9 you will narrow it down -- I mean, one of these is in
10 the 50-something -- I don't know, 60 pages.  It's
11 huge.
12      MR. DORSEY:  Isn't it better to get it
13 started now?
14      I mean, frankly, with respect to the
15 Eliopoulos Architecture case, I don't think any items
16 need to be designated from that case.
17      THE COURT:  But I want to understand -- I
18 want to hear how they think there could have been
19 something that's actually relied on in connection with
20 the decisions that are appealed from.
21      MR. DORSEY:  I understand.  Well, whatever
22 your Honor wants to do.  My preference is, we're all
23 here, let's just get started now.
24      THE COURT:  I know, and you've been here
25 since 9:30 this morning, most likely.

Page 84

1 I'll put it on another day, which is going to
2 be interesting.
3      Yes, Cindy, I realize that there's nothing
4 technically available, but I don't care.
5      MS. KLOPP:  Okay.
6      THE COURT:  This is the 6th of January.
7      MS. KLOPP:  Yes.
8      THE COURT:  Is Judge Hyman in on Monday?
9      MS. KLOPP:  No.  Monday the 11th --
10      THE COURT:  Correct.
11      MS. KLOPP:  -- is our Chapter 13 day.
12      THE COURT:  I know that.
13      MS. KLOPP:  Oh, okay.
14      THE COURT:  But I can be in another
15 courtroom.
16      MS. KLOPP:  Yes.  And you have one hearing at
17 1:30, a very brief one for Judge Hyman, at 1:30 in his
18 courtroom.
19      THE COURT:  I think that would be ideal.
20      MS. KLOPP:  Right.
21      THE COURT:  Right.  I can set it at 9:30 on
22 Monday.  We'll use Judge Hyman's courtroom, because my
23 Chapter 13 calendar will be happening in here.
24      And, Mr. Swift, you're not a regular here,
25 that means I'll have to leave a couple times.  The

21 (Pages 81 to 84)

Page 85

1 Chapter 13 calendar happens without me, except as to
2 the disputed matters, and then I have to come in and
3 hear the disputed matters.  So there will be some
4 point before lunch and some point in the later
5 afternoon -- I don't know how long we'll go, but just
6 so you know -- where I'd have to get up and leave.
7      MR. SWIFT:  I understand.
8      Your Honor, would it be possible to start at
9 ten?  I have a doctor's appointment that morning at
10 nine.
11     THE COURT:  Of course.
12     MR. SWIFT:  Is that okay ten?
13     MR. DORSEY:  That's fine.
14     THE COURT:  Of course.  Is that enough time
15 for you to get here?  Is it -- does ten o'clock give
16 you enough time to get here?
17     MR. SWIFT:  I think so.
18     THE COURT:  Okay.  Good.
19     MR. SWIFT:  I think so.
20     THE COURT:  All right.  And if you have a
21 chance to talk in the meantime, I'll let you know now,
22 for example, the matters earlier we were talking about
23 with Mr. Halmos having to do with Mr. Negron, those
24 are not matters that the clerk can include in the
25 record on appeal.  The clerk simply cannot include

Page 86

1 them.
2      MR. HALMOS:  I've already removed them in
3 what I had prepared, your Honor.
4      THE COURT:  Well, then why did we talk about
5 it at length?  Why didn't you just say, "I'm not" --
6      MR. HALMOS:  It wasn't raised.
7      THE COURT:  -- "going to insist on those?"
8 Yes, but --
9      MR. HALMOS:  I don't insist on them.
10     THE COURT:  You could have said that rather
11 than explaining to me why communications with
12 Mr. Negron were important to this case and allow that
13 to go on for 15 minutes --
14     MR. HALMOS:  I think, it is, but --
15     THE COURT:  All right.  Things like that, you
16 will need to explain to me why any matter, even in the
17 docket in the main Eliopoulos case, in the Eliopoulos
18 Architecture case, that was not actually in the record
19 at either of the two hearings, is going to be a matter
20 that should be designated in connection with the
21 appeal.  The answer is they should not be.
22     If the court references something in a
23 ruling, even if it's not in the record, then that's
24 obviously fair game.
25     I don't -- I've read the orders.  I don't

Page 87

1 remember Judge Olson referencing anything outside of
2 the record.  And just so you know, my view of the
3 February hearing is that every single lawyer assumed
4 that the record of evidence was established in -- in
5 connection with the motion to disqualify, and nobody
6 corrected that.  If that was the case, that additional
7 evidence was necessary, they should have asked for it,
8 and nobody asked for it.  I don't see why additional
9 evidence would be necessary, frankly.
10     And, then, for Mr. Halmos's benefit, I
11 routinely have people stand here and make arguments
12 about things that are not in the record, and I have to
13 ignore them.  Whenever I hear a lawyer stand up and
14 start telling me how they're -- usually it's the
15 debtor, is a very bad person or the corporate debtor
16 is run by evil people or the creditor has bad motives,
17 I don't care, and the Court does not pay any attention
18 to those things.  I have, on a number occasions in my
19 career, and we're talking about Judge Olson, who I've
20 known for -- oh, I don't know, a very long time, since
21 I moved to Florida in 1997 or '8, we have to deal with
22 those things all the time.  People make arguments, and
23 I ignore them.  One does not assume that the decisions
24 are based on the arguments made that are not supported
25 by the record.  Indeed, our job is to look at the

Page 88

1 actual record, and so the appeals court will assume
2 that that's the case.
3      If there is something in the decision which
4 would lead a person reading it to believe that a
5 specific thing, which is available to clerk and can be
6 included in the record on appeal, was considered, then
7 it can be designated.  But you don't just designate
8 things that you think may have had an impact on the
9 Court.  That's akin to designating every epi -- I read
10 the "New York Times" every day.  Should we include in
11 every matter -- every notice of appeal designation on
12 a ruling that I've made every article in the "New York
13 Times" which may have mentioned something relevant to
14 the matter that I decided?  No, because that's not
15 evidence.
16     The Court has to routinely rule on things
17 that often times we don't agree with ourselves.  Not
18 long ago I entered a judgment in favor of a person who
19 I described in my order as, literally, a criminal,
20 that the case was not proven.  It happens all the
21 time.
22     And so the belief that somehow Judge Olson,
23 who had nothing to do with this case, other than the
24 matters under appeal, was considering everything that
25 had happened in the case for years, my gosh, I think

22 (Pages 85 to 88)

Page 89

1 he has better things to do. So my view is going to be
2 what was considered in connection with the decision.
3      I encourage you, if you're defending any
4 matter, to literally point to a statement made in oral
5 findings or in the decision. If you can't do that,
6 and it was not -- the motions themselves, documents
7 filed directly in connection with the matter under
8 consideration, evidence admitted either in the form of
9 a transcript or documents, I don't think there was any
10 other type of evidence admitted, then it is not going
11 to be among the matters designated to go to the
12 District Court.
13      Hopefully that is helpful to you in
14 discussing the matter before we get together again
15 next Monday.
16      MR. HALMOS: Can I ask a clarification?
17      THE COURT: Sure.
18      MR. HALMOS: Because now I'm unclear. The
19 February 26, 2-0-1-5 --
20      THE COURT: Hearing.
21      MR. HALMOS: -- hearing on sanctions --
22      THE COURT: Correct.
23      MR. HALMOS: -- that was strictly on
24 sanctions, whether or not --
25      THE COURT: It was on the sanctions motion

Page 90

1 and other requests for sanctions in certain other
2 pleadings.
3      Correct, Mr. Dorsey? Yes.
4      MR. DORSEY: Right. There was a Rule 9011
5 motion and then the second sanctions motion.
6      THE COURT: Right.
7      MR. HALMOS: The -- what was presented to
8 Judge Olson on February 26, 2-0-1-5, is it allowed to
9 have designations to the record that relate
10 specifically to what was said to Judge Olson at that
11 hearing?
12      THE COURT: You'll have to point me to those
13 things one at a time when we get together on Monday,
14 because it's hard to make a generalization on that.
15      MR. HALMOS: Okay.
16      THE COURT: The answer is, if it appears that
17 it was considered in connection with the decision,
18 yes.
19      MR. HALMOS: Okay.
20      THE COURT: But if -- if the appeal record in
21 a trial court matter included anything anybody argued
22 in a bench trial, even if the court didn't consider
23 it, that would lead to quite amazing results, because
24 people often come in and say things to me that, in
25 fact, are not shown by the evidence.

Page 91

1      Are we supposed to assume that I made the
2 ruling based on the arguments of counsel? And I will
3 routinely tell people, I'm sure Mr. Dorsey has seen
4 it, because some lawyer will stand up and say, "I must
5 object to this," I said, "I've just ignored all of
6 that, because it's not evidence," and all I care about
7 is what's in the evidence. That's the Court's job,
8 and the appeals court will assume that that's the
9 case.
10      If there was not evidence considered or due
11 process was not met or whatever, you argue that on
12 appeal, and then the District Court sends it back for
13 further consideration. But the District Court doesn't
14 hear new evidence. They don't consider things that
15 weren't actually before the trial court.
16      MR. HALMOS: I agree.
17      THE COURT: And if you were represented by
18 counsel, he or she would probably tell you that
19 attempting to designate hundreds of items not before
20 the court that made the decision would probably not be
21 helpful to you. But, then again, you don't have
22 counsel, and you should get counsel.
23      MR. HALMOS: Thank you, sir.
24      THE COURT: Okay. Yes. I'll do a notice
25 that moves -- oh, let's go to -- there's a couple

Page 92

1 other matters on the record.
2      MR. DORSEY: That's what I was going to ask
3 about.
4      THE COURT: Motion for extension of time to
5 supplement, at 456, that's by Mr. Halmos, and then
6 there's a mere image one by Mr. Eliopoulos, which
7 essentially says if you give them more time, then we
8 should be able to add things.
9      UNIDENTIFIED SPEAKERS: Exactly.
10      THE COURT: All right. So -- and that's only
11 Mr. Halmos. That's not PAH Co., correct?
12      MR. DORSEY: No, Judge, there actually was
13 one filed by PAH Co. as well. One's at --
14      MR. SWIFT: PAH filed one as well, your
15 Honor.
16      THE COURT: Oh, let me see.
17      MR. DORSEY: One is at 454, and the second is
18 at 456.
19      THE COURT: I have so many notes. I'm trying
20 to find it. Okay, 456 is Mr. Halmos.
21      MS. KLOPP: I don't see 454.
22      MR. DORSEY: It was weird, Judge, 454 wasn't
23 on the calendar, but your Honor did enter an order
24 setting it for today.
25      THE COURT: Okay. Good. But it's not here

23 (Pages 89 to 92)

Page 93

1 anyway.
2     All right.  So additional -- they were mere
3 images, weren't they?  They were essentially the same
4 thing.  They said something like -- let me see if I
5 can find it -- sorry, I have very extensive notes now
6 on this -- "to conduct further review of items that
7 may not be in the court files and should be
8 supplemented to the record on appeal."
9     So the suggestion is there's stuff that's not
10 already in this Court's files that should somehow be
11 added to the record on appeal; is that, gentlemen,
12 what we're talking about?
13     UNIDENTIFIED SPEAKER:  The lawyers for
14 Mr. Eliopoulos raised issues from numerous other cases
15 at the sanctions hearing on February 26 to persuade
16 Judge Olson to issue sanctions from other -- they
17 pulled things from other cases, out of context,
18 misrepresented them, so as a consequence, designations
19 to those cases are required, because they are the ones
20 who made the representations to Judge Olson.
21     THE COURT:  They are the ones who made the
22 representations, can you explain --
23     UNIDENTIFIED SPEAKER:  Lawyers for
24 Mr. Eliopoulos took documents out of other cases and
25 presented them to Judge Olson --

Page 94

1     THE COURT:  They took documents, documents
2 were presented --
3     UNIDENTIFIED SPEAKER:  Yes.
4     THE COURT:  -- at the hearing.
5     UNIDENTIFIED SPEAKER:  At the hearing.  They
6 filed --
7     THE COURT:  Wait, hold on, hold on.
8     UNIDENTIFIED SPEAKER:  I'm sorry.  I'm sorry.
9     THE COURT:  Wait a minute.
10 Documents were filed.
11     UNIDENTIFIED SPEAKER:  No, and presented.
12     THE COURT:  And they were handed to Judge
13 Olson.
14     MR. DORSEY:  Maybe I can clarify?
15     THE COURT:  Well, I just want to make sure.
16     MR. DORSEY:  Sure.
17     THE COURT:  Is there somehow a document that
18 was not an exhibit?
19     MR. DORSEY:  Prior to the February hearing,
20 my firm did a notice of filing of various other
21 matters Mr. Halmos either individually or through one
22 his (unintelligible) -- involved in, at the hearing
23 Mr. Landau referenced Judge Olson --
24     THE COURT:  Obviously intended for the court
25 to consider it.

Page 95

1     MR. DORSEY:  Intended, because --
2     THE COURT:  Well, you can designated that, of
3 course.  It's in the record.
4     MR. HALMOS:  That's what we did.
5     MR. DORSEY:  In the record.
6     THE COURT:  Yes, no, I thought you were
7 talking about something, like --
8     MR. DORSEY:  Well, no, Judge, I think what
9 he's saying is -- so Mr. Halmos was involved in some
10 litigation down in Key West, I think, and so we did a
11 notice of a filing of an order that a magistrate judge
12 in that case entered.  I think, and he can correct me
13 if I'm wrong, I think Mr. Halmos is saying that that
14 now opens the door to designate items from the Key
15 West litigation --
16     THE COURT:  And that's not the case.
17     Now, if you wanted the court to consider
18 something else at the time of that hearing, and
19 Mr. Eliopoulos had brought a matter before the court,
20 you should have, through your company, which was
21 actually the party, caused something to be filed, but
22 you didn't, and it wasn't considered, and so the
23 District Court, as an appeal court, is not going to
24 consider things anew.
25     MR. HALMOS:  Well --

Page 96

1     MR. DORSEY:  If it's any consolation, Judge,
2 Judge Olson took a five-minute break at the end of a
3 hearing, came back and told Mr. Mrachek, "Mr. Mrachek,
4 you're quite right, there are some references to
5 things that aren't before me in evidence, so I'm not
6 going to consider them," so be that as it may --
7     THE COURT:  Not surprising.
8     MR. HALMOS:  Well, when you read the
9 transcript and his order --
10     THE COURT:  Well, then you can bring that to
11 my attention at the next hearing.
12     MR. HALMOS:  I will, your Honor.  Thank you.
13     THE COURT:  It has to be very specific,
14 though --
15     MR. HALMOS:  Absolutely.
16     THE COURT:  -- you need to be able to say,
17 "Judge, the reason this document that I'm pointing to
18 should be included in the record is because Judge
19 Olson referred to it," or "He indirectly referred to
20 it in this manner, and it's clear that he considered
21 this."  I need to know that he considered it.  We're
22 not going to guess about things that are not in the
23 record, that you think somehow Judge Olson considered.
24     MR. HALMOS:  Well, when it's presented to the
25 judge for his consideration --

24 (Pages 93 to 96)

Page 97

1      THE COURT:  When it, what is "it"?
2      MR. HALMOS:  When something --
3      THE COURT:  A topic.
4      MR. HALMOS:  -- XYZ is presented to the judge
5 for his consideration for the purpose of obtaining the
6 order --
7      THE COURT:  Okay.
8      MR. HALMOS:  -- how am I to determine whether
9 the judge considered that or not?
10     THE COURT:  That thing, what was presented to
11 him --
12     MR. HALMOS:  Next question --
13     THE COURT:  Stop.
14     MR. HALMOS:  Yes.
15     THE COURT:  -- if it's a statement made by
16 counsel, it's already in the record, and if it's
17 another document, either the court had it or did not
18 have it.  If the court had it, it was either admitted
19 or not admitted.  It is actually possible to have the
20 record on appeal include documents presented to the
21 court but declined to be admitted into evidence in
22 certain circumstances.
23     But if it was not physically in front of the
24 court, then the appeals court will assume that it was
25 not consulted.

Page 98

1      MR. HALMOS:  If I could ask?
2      The day before the February 26 hearing,
3 Mr. Eliopoulos's lawyers filed notices of filing with
4 numerous documents from other cases I've been involved
5 in and cases they wanted to argue at the hearing that
6 Mr. Mrachek hadn't even seen, so he -- Mr. Mrachek is
7 hit with these at the hearing, and as to these other
8 documents from various cases that were filed at the
9 last minute, Mr. Mrachek doesn't have anything he can
10 respond to.  He didn't even see it, so this was the notice of
11 filing.  So this hits him cold, how can he rebut?
12     So wouldn't it be fair, under these
13 circumstances, to allow certain rebuttal documents for
14 the appellate court to consider?
15     THE COURT:  Were any of these matters
16 admitted?
17     MR. DORSEY:  No.
18     THE COURT:  All right.
19     MR. DORSEY:  Judge Olson --
20     THE COURT:  Then the answer, Mr. Halmos, is
21 no it would not be fair.  It's not required under the
22 rules.
23     MR. HALMOS:  Nothing was admitted.  It wasn't
24 evidentiary.
25     THE COURT:  Mr. Halmos, you should go read

Page 99

1 the transcript.  I strongly advise --
2      MR. HALMOS:  I did.
3      THE COURT:  You need to stop interrupting me.
4      MR. HALMOS:  Okay.  Sorry.
5      THE COURT:  I strongly advise you to get a
6 lawyer.
7      MR. HALMOS:  Thank you.
8      THE COURT:  I'm going to give you one piece
9 of unsolicited advice.  A good deal of your behavior
10 in writing and personally in the courtroom will not --
11 if you appear in connection with the appeal will not
12 assist your cause.
13     MR. HALMOS:  Thank you, sir.
14     THE COURT:  And it will not assist the cause
15 of your company, PAH Co.  You need to get competent
16 counsel who understands bankruptcy matters and appeals
17 to represent you in this case.
18     MR. HALMOS:  Thank you very much.
19     THE COURT:  It is well worth the extra money.
20     MR. HALMOS:  Thank you very much, sir.
21     THE COURT:  I strongly advise you to do that.
22 I'm not going to be making the decision.  My opinion
23 has nothing -- I have nothing to gain from this at
24 all.
25     I hope that whatever decision comes out of

Page 100

1 the District Court or the Eleventh Circuit, wherever
2 this goes, is the correct decision in the end, and I
3 won't care.  But I do care when I see somebody who is
4 doing things and saying things in court and filing
5 things that say other things that you should not do,
6 and it would be very wise for you to get legal
7 representation.
8      MR. HALMOS:  I appreciate your advice, sir.
9      THE COURT:  Okay.  I'll see you -- and you
10 can try and do that before Monday.
11     MR. HALMOS:  Thank you sir.
12     THE COURT:  But I'm going to go through all
13 the matters on Monday whether you have a new lawyer or
14 not.
15     MR. HALMOS:  Thank you, sir.
16     MS. KLOPP:  Will I be continuing Docket 454
17 and 456?
18     THE COURT:  No, I need to address those right
19 now.
20     MS. KLOPP:  Oh.
21     THE COURT:  Okay.  So you need more time to
22 add things to the record.  Why more time?  There was
23 enough time.
24     MR. HALMOS:  That -- the motion that I asked
25 for, I have done a lot of the work already and it's

25 (Pages 97 to 100)

Page 101

1 prepared to -- to address some of the concerns and
2 also --
3       THE COURT:  I don't understand what you're
4 saying.  You want to add things to the designation of
5 record on appeal, correct?  That's what you want more
6 time for?
7       MR. HALMOS:  And delete things.
8       THE COURT:  Well, deleting things we have no
9 problem with.  We can take care of that on Monday.
10      MR. HALMOS:  Okay.
11      THE COURT:  You want more time to add things.
12      MR. HALMOS:  I don't --
13      The COURT:  What things?
14      MR. HALMOS:  -- need any more time.
15      THE COURT:  Okay.  That motion will be denied
16 by my own order.
17      PAH Co. as well?
18      MR. SWIFT:  The purpose of PAH Co.'s motion
19 was to review some of the transcripts, because I don't
20 have an intimate familiarity with all of them to get a
21 better handle on what should be in there too.  As your
22 Honor spoke about --
23      THE COURT:  And the transcripts have been
24 around for awhile, have they not?
25      MR. SWIFT:  They have --

Page 102

1       THE COURT:  And have you filed anything else?
2       MR. SWIFT:  I have not filed anything else.
3       THE COURT:  You realize that both of you
4 asked for ten days, and the ten days has already
5 expired?
6       MR. SWIFT:  Yes.
7       THE COURT:  And you didn't do anything.
8       MR. SWIFT:  Correct.
9       MR. HALMOS:  That's --
10      THE COURT:  Okay.  All three motions are
11 denied.  I'll do my own order.  There's no need for
12 your motion.  It was a mere image of theirs.
13      Why should I give you more time to designate
14 additional items?
15      MR. DORSEY:  It's mostly in an abundance of
16 caution, Judge.  The way I read Rule 8009 is the
17 appellants designate, and then the appellee gets two
18 weeks to look at it and say, "Do I need to do anything
19 to this record," and so I think as a practical matter,
20 your Honor is right, but I think we are -- the
21 appellee is entitled to see the appellants' final
22 designation, whatever that may be.
23      THE COURT:  Well, it will be like the ones
24 that I have, with fewer things, so you already know
25 what they are, and you've design -- you've done your

Page 103

1 designation.  You don't get to look at it again.
2       MR. DORSEY:  Okay.
3       THE COURT:  All three motions will be denied.
4       All right.  Good.  Thank you all.  See you on
5 Monday.
6       MR. HALMOS:  Thank you, sir.
7       MR. DORSEY:  Thank you, Judge.
8       THE COURT:  Good afternoon.
9       (Whereupon, the hearing was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1               CERTIFICATE
2
3 STATE OF FLORIDA:
   COUNTY OF PALM BEACH:
4
5       I, Anna M. Meagher, Shorthand Reporter and
6 Notary Public for the State of Florida at Large, do
7 hereby certify that the foregoing proceedings were
8 transcribed by me from an audio recording produce in
9 the cause, at the time and place, and in the presence
10 of the Court and counsel as stated in the caption
11 hereto on Page 1 hereof; that the foregoing
12 computer-assisted transcription, consisting of pages
13 numbered 1 through 104, inclusive, is a true and
14 accurate transcription of said recording to the best
15 of my ability.
16      I further certify that I am not of counsel, I
17 am not related to nor employed by any attorney in this
18 case.
19      Dated this 10th day of January 2016.
20
21      _____
22 My Commission Expires:  Anna M. Meagher, Notary Public
   January 8, 2017       State of Florida at Large
23 Commission #EE852439
24
25